ROBERT H. McCARTER, attorney-general, appellant,

v.

FIREMEN'S INSURANCE COMPANY et al., respondents.

[Argued November 26th, 1907.   Decided June 14th, 1909.]

1. If a corporation engaged in a business that is affected with a public interest contracts to enter upon a line of conduct in respect to such business that tends to affect such public interest injuriously, and is contrary to public policy, such contract is *ultra vires* such corporation, and may be restrained in equity at the suit of the attorney-general without regard to whether or not actual injury has resulted to the public.

2. The business of fire insurance as it is carried on in this state by corporations created, licensed and regulated by the state, is a business affected with a public interest within the meaning of this rule.

3. *Quasi*-public corporations, *i. e.*, those "affected with a public interest" defined.

4. The case of *Munn* v. *Illinois, 94 U. S. 113*, applied.

5. A contract in restraint of trade entered into by fire insurance companies, the necessary effect and the actual result of which are to control such business within a certain area, and within such area to fix and regulate prices and to limit or eliminate competition to the injury of the public, is contrary to public policy, and *ultra vires* such corporations and may be restrained in equity at the suit of the attorney-general.

6. The rule in equity that contracts in restraint of trade are merely unenforceable does not require that the parties so contracting be deemed to be immune from ordinary equitable remedies when their violation of public policy is directed at and actually works a public injury.

On appeal from a decree advised by Vice-Chancellor Stevens, whose opinion is reported in *70 N. J. Eq. (4 Robb.) 291*.

The decree of the court of chancery dismissed an information filed by the attorney-general against eight domestic fire insurance companies and one hundred and thirteen foreign fire insurance companies praying for a decree adjudging a certain agreement in writing entered into by the defendants to be void as an *ultra vires* act injurious to the public, and that the said companies be enjoined from continuing to act under such agreement.

The contract in question which was annexed to the bill and occupies twenty-two closely printed pages constitutes the subscribing companies, members of "The Newark Fire Insurance Exchange," and covers apparently every detail necessary to vest in such exchange the fixing of the premium rates to be charged for insurance by the constituent companies and to render it as far as possible impractible to obtain fire insurance within the area covered by the exchange otherwise than from its constituent companies and upon the rates fixed by it. The area thus covered includes the city of Newark and certain outlying and adjacent districts in Essex and Hudson counties. The salient features of this contract pertinent to this appeal are—*first,* that the premium rates to be charged by the constituent companies shall be fixed by a central association through an executive committee of five of its members, such central association being composed of a single representative of each constituent company and such executive committee including uniformly one member representing all of the domestic companies; *second,* that no member of the exchange shall write policies at any other rate than that fixed by the exchange; *third,* that the only brokers to whom members of the exchange shall pay brokerage for business obtained through them shall be those holding a broker's certificate from the exchange, in order to obtain which such broker must pledge himself not to place any insurance with any insurance company that is not a member of the exchange, unless, after giving preference to the members of the exchange, sufficient insurance cannot be obtained. Upon receipt of a broker's certificate the broker must agree, in writing, to observe the rules of the exchange that forbid rebating and "to act only as the agent of the assured in placing contracts for insurance."

The information charged that this contract rendered it practically impossible to obtain fire insurance within the covered territory save from the companies that had subscribed to such contract and at the premium rates fixed in accordance with its, terms, and that the rates so fixed are sixty per cent. higher than the rates that prevailed in the same territory prior to the making of this contract and that now prevail in the immediately adja-

cent territory not covered by the contract. The relief prayed by the information was that the defendants be enjoined from continuing or doing any act under said contract that tended to fix the rates to be charged for fire insurance or to prescribe the persons through whom insurance may be placed or the mode of payment therefor.

A mass of testimony substantiating on the one hand the averments of the information and justifying on the other hand the propriety of the rates fixed and the methods employed by the exchange was taken and the case thus made·brought to final hearing before the vice-chancellor, who advised that the information be dismissed, not because its charges and averments had not been proven, but because, assuming that they had been proved, the contract in question, while one that a court of equity would not aid a party to such contract in enforcing against another party to it, was not one that a court of equity, at the instance of the state, would restrain the defendants from entering into or continuing to the public injury. Precisely what was decided is thus abstracted in the headnotes to the vice-chancellor's opinion: "1. The common law does not treat agreements in restraint of trade as being illegal in the ordinary sense of the word but merely as being unenforceable. 2. In the absence of a statute authorizing it, the attorney-general may not maintain a suit to enjoin insurers against carrying out an agreement regulating rates, though against public policy, as in restraint of trade, and the fact that the insurers are corporations makes no difference."

Upon the ground thus stated the information of the attorney-general was dismissed, and from the decree to that effect this appeal was taken and argued, after which a reargument was ordered and had covering certain further matters upon which the court desired to hear the views of counsel.

*Mr. Robert H. McCarter,* attorney-general, and *Mr. Malcolm MacLear,* for the appellant.

*Mr. Bennet Van Syckel* and *Mr. Richard V. Lindabury,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

The learned vice-chancellor, who advised that the information filed by the attorney-general be dismissed on the ground that the court of chancery could not give relief in such a suit, said at the conclusion of his opinion : "If those corporations were public or *quasi*-public bodies, and if the attorney-general were here asking to enjoin them from doing *ultra vires* acts to the public injury as in *Attorney-General* v. *Central Railroad Co., 50 N. J. Eq.* (*5 Dick.*) *52*, the case would be different."

We agree with the learned vice-chancellor as to the class of corporations and of corporate acts to which the rule of *Attorney-General* v. *Central Railroad Co.* applies, but we do not agree with him that the defendants are not within such class. The pertinent language of Chancellor McGill in *Attorney-General* v. *Central Railroad Co.* is : "Where a corporate excess of power tends to the public injury or to defeat public policy, it may be restrained in equity at the suit of the attorney-general." The case of *Attorney-General* v. *Central Railroad Co.*, which did not itself come to this court, has since its decision by Chancellor McGill in 1892 been followed in the court of chancery, and has been approved and acted upon by this court, notably in the recent case of *Attorney-General* v. *Vineland Light and Power Co., 73 N. J. Eq.* (*3 Buch.*) *703*, where the decree that was affirmed had been advised by Vice-Chancellor Leaming, as to this point, upon the express authority of *Attorney-General* v. *Central Railroad Co., 50 N. J. Eq.* (*5 Dick.*) *52*.

In the case of *Attorney-General* v. *American Tobacco Co., 55 N. J. Eq.* (*10 Dick.*) *352*, Vice-Chancellor Reed said : "It may be conceded that if this corporation had entered into an agreement with other manufacturers of these goods, whether those manufactures were individuals or corporations, by which agreement prices were to be fixed and competition paralyzed, such an agreement would be a subject of equitable cognizance. Such was the case of *Stockton, Attorney-General,* v. *Central Railroad Co., 50 N. J. Eq.* (*5 Dick.*) *52*." This opinion was adopted by this court.

In *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. (12 C. E. Gr.) 631*, Mr. Justice Dixon, speaking for this court, said: "In equity as in the law court the attorney-general has the right in cases where the property of the sovereign or the interests of the public are directly concerned to institute suit by what may be called civil information for their protection."

Professor Pomeroy (section 1093) states the rule thus: "When the managing body are doing or about to do an *ultra vires* act of such a nature as to produce public mischief, the attorney-general, as the representative of the people and of the government, may maintain an equitable suit for preventative relief."

In England the same rule prevails. *Attorney-General* v. *Cockermouth Local Board, L. R. 18 Eq. Cas. 172; Attorney-General* v. *Shrewsbury Bridge Co., L. R. 21 Ch. Div. 752; Attorney-General* v. *London and N. W. Ry. Co., 1 Q. B. (1900) 78.*

The rule of the American courts to the same effect as that laid down by Chancellor McGill is epitomized in *20 Am. & Eng. Encycl. L. 850*, under the title, "Monopolies and Trusts," where numerous cases are cited in the notes. A complete collection of such cases will also be found in the two volumes of *Lewson's Monopoly and Trade Restraint Cases,* which work is, in effect, a collection of the *syllabi* of the opinions delivered by American courts upon this topic.

The rule illustrated by all of those cases and the one that we should adopt, if we have not already done so, is that if a corporation, engaged in a business that is affected with a public interest, contracts to enter upon a line of conduct in respect to such business that tends to affect such public interest injuriously and is contrary to public policy, such contract is *ultra vires* such corporation, and may be restrained in equity at the suit of the attorney-general without regard to whether or not actual injury has resulted to the public. The expression "corporation affected with a public interest" is to be preferred to the term "*quasi*-public corporation" as tending, in some measure at least, to characterize the class of corporations indicated, whereas the term "*quasi*-public" is characterized only by its unmeaning vagueness. In

the discussion, and still more in the application of this rule, it will, of course, be necessary to amplify the expression "affected with a public interest" to the extent of stating just what is meant by that term, and also to discriminate between acts that are *ultra vires* a corporation and those that are merely illegal, and also to make clear what "tends" to public injury, for it is upon the concurrence of these three factors that the applicability of the rule in question depends.

Upon this branch of the present inquiry, therefore, the pertinent questions are:

*First.* Are the defendants engaged in a business affected with a public interest?

*Second.* Is the contract into which they have entered one that is *ultra vires* such corporations? and

*Third.* Does such contract tend to affect such public interest injuriously?

The first question, and that upon the answer to which this branch of the case virtually turns, is whether or not the business of fire insurance as carried on in this state is a business affected with a public interest within the meaning of the rule enunciated in *Attorney-General* v. *Central Railroad Co.* The answer to this question does not depend, as counsel for the respondents argue, upon whether the defendants were expressly created as public agents, or whether the state has expressly charged them with the performance of a public duty or has to that end clothed them with monopolistic privileges or granted to them its right of eminent domain or required that they insure the property of all citizens alike. These are *indicia* by which the existence of "a public interest" may be readily discerned, but, so far from "the public interest" arising out of these incidents, the fundamental fact is that they arise out of such public interest. In natural course the public interest first arose, and afterwards, and because of such interest, all of these incidents were added unto it. In their inception all public callings were private ones whose history has consisted in the evolution of a public character and of the incidents that they now possess. "First the blade, then the ear, after that the full corn in the ear."

Such at the common law was the course by which common carriers and all of the callings now recognized as affected with a public interest to be *juris privati* only and became matters of public concern.   More than two centuries ago Lord Chief-Justice Hale, in his treatise *De Portibus Maris,* said that when private property is "affected with a public interest it ceases to be *juris privati* only" (*1 Harg. Law Tr. 78*), illustrating this by the case of a man who sets up on his land a crane that in due course ceases to be *juris privati* and becomes subject to public regulation.   This statement of Lord Hale was cited with approval and applied by Lord Kenyon a century later in *Bolt* v. *Stennett, 8 T. R. 606,* "and has," said Chief-Justice Waite, speaking for the supreme court of the United States still a hundred years later, "been accepted without objection as the law of property ever since." *Munn* v. *Illinois, 94 U. S. 113.*

"Property," Chief-Justice Waite continues, "does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large.   When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created."

One significance of this statement of the law of property is that it speaks in the present tense, viz., "property *does* become clothed with a public interest," not *did* become so clothed once upon a time; another is its recognition of the fundamental law that public interest arises essentially from the uses to which a man puts his property and not from a force *ab extra;* and yet another is that, knowing this to be the law, men engage in certain callings knowing that the business they so embark in will, if success attend it, become affected with a public interest.   "They entered upon their business and provided the means to carry it on subject to this condition," he says; and speaking to the point, that it was of no moment that a direct precedent could not be found, Chief-Justice Waite says: "It is conceded that the business is one of recent origin, that its growth has been rapid and that it is already of great importance," and reaching the conclusion that the public interest was affected he adds: "It presents,

therefore, a case for the application of a long-known and well-established principle in social science.  \*  \*  \*  There is no attempt to compel these owners to grant the public an interest in their property, but to declare their obligations if they use it in this particular manner."

The force and significance of these statements of the highest court in our land is enhanced by the fact that the property owners, with respect to which they were made, were private individuals, and the business concerned that of storing grain in private warehouses. The fact that the question in *Munn* v. *Illinois* was the right of the public through its legislature to deal with a use of private property as affected with a public interest rather than with the right of the public so to deal with it in the courts, is of no significance upon the point for which the language of the decision is now cited. Upon the underlying proposition that a business, private at its inception, may become affected with a public interest, it is immaterial that the question of its public character arose in a case where its restraint had been legislatively rather than judicially determined. Upon this point, *Munn* v. *Illinois,* as was said by Chief-Justice Waite, introduced no novel doctrine. What it did was to call attention to the fundamental relation that exists between the use of private property and the creation of a public interest in such use and its chief value as a contribution to jurisprudence, was that it pointed out clearly that in the determination of such a relation the underlying question was not what the state had done to impress a public interest upon a business, but what the owners and operators of such business had done to draw to and thus clothe themselves with a public interest; for in *Munn* v. *Illinois* the state had done absolutely nothing. The vast importance of the maintenance of this point of view by the courts of this country must be conceded when we consider that to an unprecedented extent business enterprises are launched the success of which depends upon the extent to which the public can be attracted to them and constrained to lean upon them. Public support of this character is essential to the success of these enterprises, and hence, is from their inception the *desideratum* of their promoters. When, therefore, success along these lines has been attained, it brings

with it duties to the public, whose interests are involved, of precisely the same nature as if such duties had been imposed by public law upon such enterprises at their inception. This is the principle that was recognized and applied in *Munn* v. *Illinois,* and if it be sound, as applied to individuals, it must, *a fortiori,* be sound as regards corporations. To the eye of the law and in the interest of the public, it is one and the same thing whether a corporation be created to subserve a public interest or whether such corporation achieve success of such a nature that the duty of regarding the interest of the public is thrust upon it. Aptly the words of the great dramatist may be paraphrased, viz., that some corporations are born to serve the public, some achieve that end and some have it thrust upon them; and (as in the state of man) the last two conditions are so correlated that when the interest of the public has been woven into a business as a *sine qua non* of its success, the success thus achieved thrusts upon such business a co-ordinate duty that clothes it to that extent with a public interest. It is in accordance with this principle that the entire class of callings we are considering have come into existence. Railways, ferries, inns, warehouses, or what not, have in their day had this same origin and history. When the first waterman held out to his neighbors a means of ferriage other than in their separate boats, and when the first teamster undertook to carry families and their produce to the market town, the foundation of the modern law of common carriage was laid, and, as success attended these undertakings by their successful appeal to the public, a public interest in them arose which in time was recognized and acted upon by legislatures and by courts alike, the power of eminent domain and other privileges being granted in order that such public interest might be the better served, the duty of serving all alike and of refraining from excessive charges by combination or otherwise being imposed that such public interest might be the better safeguarded. To confuse, therefore, these incidents and *indicia,* with the fundamental relation out of which they arose, or to say that such fundamental relation between the use of private property and the public interest therein, is a thing of the past, and that such relation is not just as sound and fruitful now as then, is to

take a totally illogical position the acceptance of which would disarm the courts of to-day of defensive weapons of which the public stands in more need now than it did then.    It is, therefore, a shallow argument to say that a court cannot restrain corporations from *ultra vires* acts injurious to the public because such corporations have not been given the right of eminent domain or because they have not been compelled to insure all of the property of all of the people.    When the public interest will be furthered by such power or by such duty they will come into existence but not otherwise.    What, for instance, would a fire insurance company do with the power of eminent domain, or how would law-abiding insurers be benefited by requiring these companies to insure the property of incendiaries?    The same law, both as to the attainment of a public interest and as to the incidents that shall attach to it, is operative now as in the past, and the same history still repeats itself whenever a business or calling that was either unknown to the common law, or of no public import then, insinuates itself into modern business methods so that it becomes a matter in which the public is vitally concerned.    Of this there can be no more apt an example than the business of fire insurance as carried on by these defendants under modern conditions and under the laws of this state. If such business were still in the hands of individual underwriters, unaffected by state regulation and confined to the writing of policies on the dwellings of prudent householders and on the stores of careful merchants, a great deal might be said in favor of the view that no public interest had attached to the making of these private contracts.    We cannot, however, close our eyes to the fact that by the enormous extension of this business, by its concentration in the hands of immense corporations, by state regulations that amount to privileges and by its practically universal employment as a collateral security for debts, the business has become one in which the interest of the public is directly involved, certainly as much so as it is in the warehousing of grain.    The collateral security of mortgage debts would alone suffice to attach a public interest to the business in question since it vitally concerns credit as a factor in modern business.

Whatever concerns business credit *ex necessitate* touches a matter in which the public is directly interested. The impairment or embarrassment of business credit affects immediately not only the demand for money and the volume of business transacted, but also the inauguration of new enterprises, the employment of people and the payment of the wages they would otherwise receive and spend and thus ramifies in its effects from the greatest banking houses, through the homes of the unemployed or the badly paid, to the smallest retail shops. By the introduction and perfection of title insurance a practically new commercial utility has been imparted to real property, which, under such new conditions performs a recognized service in the immediate obtaining of credit for commercial needs or in business emergencies. The collateral indemnification of credit thus obtained has become one of the chief, if not the chief business of modern fire insurance, and I doubt whether, within twenty years past, a mortgage on improved property has been given that did not covenant for such insurance and for its maintenance under the penalty of immediate foreclosure. The public, greatly to the benefit of the insurance business, has become educated to this system and to lean upon it and to shape their business ventures in reliance upon it. Such education and such reliance, which were, of course, beneficial and properly so to the insurance companies, have so entered into the woof and warp of general public business that nothing that can be conceived of would produce greater disturbance or profounder catastrophe than the cancellation of such policies or the withholding of such insurance. It seems to me that it is impossible to say that by its very growth and success the business of fire insurance has not become affected with a public interest within the principle of *Munn* v. *Illinois.* That it is deemed for legislative purposes to be so affected is evident from the voluminous code enacted in this state for its regulation in the interest of the public. *P. L. 1902 pp. 407-447.* It is pertinent, at this point, to ask why the state should enact a regulative code for the protection of a public interest that does not exist. Moreover, some of the provisions of this code, while in form regulations imposed upon insurance companies, amount practically to privileges accorded to them. Indeed, it is by rea-

son of the privileges thus enjoyed by foreign companies that the present combination is rendered feasible. In such case, *i. e.,* where foreign corporations that have been accorded the privilege of transacting their legitimate business in this state use such privilege to engage with our domestic companies in a compact inimical to the interests of the people, it would be a salutary and, I am inclined to think, a sound rule of law that would estop such foreign corporations to deny that they were enjoying such a privilege from the state as made them amenable in the premises to its court of equity. A state that had granted such a privilege should, it seems to me, be entitled, with a reasonable expectation of being heard, to apply to its own courts for preventive relief based upon the abuse of the privilege it had granted. Be this as it may, we think that it is impossible for the unbiased mind to reach the conclusion that the business of fire insurance as now conducted in this state, by corporations created, licensed and regulated by the state, is not a business affected with a public interest, but that the storage of grain by private individuals is so affected. Yet such is the conclusion we reach, unless, so far as in us lies, we overturn the decision of the supreme federal court in *Munn* v. *Illinois,* a decision that has been followed in cases so numerous that their citation from state reports would be superfluous and of which Mr. Justice Harlan, speaking at a later period, said: "The doctrines of *Munn* v. *Illinois* have never been modified by this court," *i. e.,* the supreme court of the United States. *Civil Rights Cases, 109 U. S. 62.*

The conclusion we reach from these considerations is that the business of the defendants is in point of fact one that directly affects the interests of the public, and that such public interest has been recognized as a subsisting one by the legislature of this state, and that, in point of law, the business of the defendants is affected with a public interest.

*Second.* We have next, therefore, to consider whether or not the contract by which the defendants have agreed that their several corporations shall be bound is *ultra vires* such corporations. In this regard, the eight domestic companies stand in one respect in a position different from the hundred and odd foreign

defendants. These domestic companies received their charters from this state in order that they might transact legitimately a business in which, as we have seen, the public is interested. To this end all general provisions essential to the lawful government of corporations are deemed to be written into their respective charters. Among these general provisions is that "the business of every corporation shall be managed by its directors" either by force of the express mandate of section 12 of the General Corporation act of 1896 or because such is an imperative implication of the law of corporations. We cannot agree with the views of the respondents' counsel as expressed in their brief, viz., that

"the provision that the company shall be managed by a board of directors is simply intended to show where the powers which may be exercised by the company shall, as between the shareholders and those who deal with the company, reside,"

or that

"the provision in section 12 of the act of 1896 was not intended for the protection of the general public, and failure on the part of the directors to perform their duty in the management of the affairs of the company concerns only the shareholders and the policyholders."

The statute says all that counsel say it means, but it also says more, and we take it that a statute means all that it says. We do not concede or believe that the sole object of section 12 was to inform stockholders of what they already know, viz., that the business of their corporation was to be managed by the officers selected by them for that purpose rather than by somebody else. Neither do we believe that a corporation affected with a public interest could insert in its certificate of incorporation a frank avowal that its business was not to be managed by its own directors and then successfully set up as against the state the argument now advanced in justification of the respondents' construction of the statute. Counsel confuses, it seems to us, the force to be given to the statute with the occasions upon which such force is to be given to it. Where the question cannot be raised the meaning of the statute is immaterial. It is, for in-

stance, immaterial to the public and to the state representing the public whether the business of a company organized to manufacture bicycles or to make wall paper is managed by its directors or by its office boys. That is not the case here. These domestic companies were chartered to insure the property of citizens of this state under legitimate conditions. One of the most important and responsible duties that devolved upon the managers of these companies was, therefore, the fixing of the rates to be charged the citizens therefor. A contract by which the directors of such corporations in conclusive form abdicate their duty of management in this respect and turn it over to an alien body is in direct violation of the words and meaning of the statute and is as typical an instance of an *ultra vires* act as can well be imagined. To do so in a given instance would be an illegal act, but the act of binding the corporation by contract to a settled policy of illegal acts is beyond the power of the corporation, *i. e.,* is *ultra vires*. That this is no academic criticism appears clearly from the fact that the Central association erected by the contract by which, through a sub-committee of five, rates are fixed consists of but one representative of each constituent company. Hence in a body of one hundred and twenty-one the New Jersey companies have but eight votes, and in the sub-committee they have but one vote to four cast by foreign corporations. It is inevitable, therefore, that the influences affecting such foreign corporations, the losses they may have sustained, the expenses they have incurred, the salaries they design to pay, the dividends they desire to declare, will all be reflected and asserted in the fixing of the rates to be charged for insurance to the citizens of this state. These rates, and these only, the New Jersey companies by the contract in question bind themselves to charge, although such rates may be greatly in excess of anything required or justified by local conditions or by the business of such domestic companies if managed by their own directors. *Pro tanto* this amounts to a merger of corporate management accomplished by means other than those sanctioned by law. It also places it out of the power of the domestic companies to manage an important feature of their business with respect to the public interest with which it is affected. While these considerations

apply directly to the New Jersey companies only, they apply indirectly to the foreign companies also which have used their privilege to do business in this state to render feasible a contract scheme that is *ultra vires* the New Jersey companies. Foreign corporations are permitted to do business in states other than that of their incorporation by comity, not of right. It is fundamental that such corporations have no other or greater powers than do corporations organized under the laws of such state. It would be, therefore, a total subversion of law and reason to hold that a foreign corporation had in this state the power to make with corporations of this state a contract affecting a matter of public interest that such corporations of this state had not themselves the power to make. Comity does not extend to a permission to combine with domestic corporations in a way that tends to public injury. A court of equity would be short-sighted indeed that did not see this, and short-armed if it could not reach out to prevent it. We have, therefore, no hesitation in concluding that the *ultra vires* quality of the corporate contract by which the Newark Fire Insurance Exchange was brought into existence is attributable to all of the corporations that subscribed to such contract, the foreign as well as the domestic.

It is said that a court of equity will not take notice of the *ultra vires* nature of the contract into which these defendants have entered, for the reason that such contract being in restraint of trade is one that they cannot be forced to observe and this had conclusive weight with the court below. For present purposes the plenary answer is that the test of *ultra vires* is the power of a corporation to make a contract, not its power to break it.

*Third.* Upon the question whether the contract that resulted from these *ultra vires* acts tends to affect the public interest injuriously, little remains to be said, and that little can be better said under the second branch of this appeal, which we shall now proceed to consider. Upon the first branch our conclusion is that because the business of the defendants is affected with a public interest a court of equity should restrain their *ultra vires* acts at the instance of the attorney-general, if such acts tend to

public injury, without regard to whether public injury had in fact resulted, and that the contract in question does so tend.

2. Under the second branch of the case we shall assume that the business of the defendants is not, in the general sense, affected with a public interest and that the attorney-general must show that actual public injury has resulted from an unlawful combination in restraint of trade and is therefore *ultra vires* the contracting companies.

As this was the point of view from which the learned vice-chancellor regarded the case in advising that the information be dismissed, it is necessary at this stage to determine whether the reasoning that led the court below to apply to the attorney-general, seeking to avoid a contract repugnant to public policy, the same rule that obtains in that court when a party to such contract is seeking to enforce it, is sound.

Upon this point the court below laid down two propositions—*first,* that the attorney-general could not maintain a suit to enjoin parties to an agreement regulating rates though against public policy as in restraint of trade, and *second,* that the fact that the parties to such agreement were corporations made no difference.

As to the first of these propositions, it is, perhaps, only necessary that we should withhold our assent, but as to the second, we must record our express dissent.

Before leaving the first of these propositions, however, we should say that the fault we find with the vice-chancellor's conclusion is not in the soundness of the rule of mere unenforceability as applied to the class of cases in which it properly obtains, but in the extension of such rule to a subject not properly or at all within its purview, viz., the right of the state to preventive relief in aid of public policy. There is something startling, not to say appalling, in the proposition that the state is to be met in its courts with a denial of its right to relief upon the ground that the rule of non-intervention that is applied to the violators of such public policy must also be applied to the public that is injured by such violation.

The rule in question is itself an application of the maxim *in pari delicto,* &c., and hence is in strict analogy with the

judicial policy by force of which courts decline to aid in the distribution of plundered property, but it is quite illogical to say to the man who has been despoiled, "Because we refused our aid to those who despoiled you, therefore we must decline to aid you." Yet this or something very like it is what we are asked to say.

The case of *Mogul Steamship Co.* v. *McGregor, 23 Q. B. D. 598,* cited by the vice-chancellor and relied upon by counsel for respondents, is not in point. There a court of law decided that a contract in restraint of trade, made by one set of shipowners, did not give another set of shipowners a legal cause of action against them for damages. The case has no bearing whatsoever upon the attitude of a court of equity when a suit is brought on behalf of the state in the interest of the public.

That the reasoning of *Mogul Steamship Co.* v. *McGregor,* even within the lines of its decision, is not likely to commend itself to jurisprudence generally is pointed out in an instructive article on "The Case of the Monopolies," by Sidney T. Miller, Esq., in the *Michigan Law Review,* for November, 1907. Upon the point we are considering, the case has no bearing whatsoever.

This digression should not, however, be further extended as the same ground is necessarily covered in expressing our dissent from the second proposition on which the court below based its dismissal of the attorney-general's information, viz., that the fact that the defendants were corporations made no difference as to the right of the attorney-general to maintain such suit.

Laying aside, therefore, the rule applicable to individuals who have entered into an agreement contrary to public policy, in that it is in restraint of trade, and taking up a question that could by no possibility be involved in or decided in such a case, viz., the *corporate power* to enter into or continue under such an agreement, we perceive at once that such question lies entirely outside of the rule that was deemed in the court below conclusively to foreclose it. That such contracts are contrary to public policy is admitted upon all sides, in fact, it is precisely because of their contravention of public policy that the courts refuse to countenance them. In the creation of its corporations no state, I suppose, confers upon them in express terms the power to make

contracts that violate its public policy. Where such a power is not expressly given, it will certainly not be deemed by a court of equity to exist by implication. A contract that a corporation has neither the express nor the implied power to make is one that is beyond its power to make, *i. e., ultra vires.*

The circumstance that a corporation makes such a contract, relying upon the non-intervention of the courts, does not clothe the corporation with the needed power that it lacked to make such contract; it merely shows the inducement to make it, and how such violator of public policy will, under such rule, be protected from public redress by the very agreement by which the public is injured. The rule of mere unenforceability thus relied upon makes, however, an exception even as to the parties *in pari delicto,* which is thus stated by Judge Story: "In cases where the agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis,* is not in equity material. The reason is, that the *public interest* requires that relief should be given; and it is given to the *public* through the party." *1 Story Eq.* § *298; Cone* v. *Russell, 48 N. J. Eq.* (*3 Dick.*) *217.*

It would seem, therefore, that the rule enforced by the learned vice-chancellor applies to actions based *on* the repudiated contract, but not to those in which its repudiation may be assumed by the court, whether as fact or as fiction.

The fiction of acting for the public by which relief is granted to a party *in pari delicto,* must *a fortiori* apply to the public itself when actually acting in its own interests. The fundamental principle recognized by this line of cases is that one who has entered into a contract that contravenes public policy owes to the public the continuous duty of withdrawing from such contract. A duty thus owing to the public is, upon familiar principles, presumed by courts to be performed, and such presumption should be indulged in by the courts whenever necessary to give to the public, acting through its official representative, the same standing that the actual performance of such duty gives to one *in pari delicto* to act for the public.

It would be inconceivably absurd that the defendants, in re-
buttal of this presumption, should be heard to say that because
to their original violation of public policy they had superadded
a violation of another public duty they were immune from ordi-
nary judicial control.  Yet such is the state of our jurisprudence
under the rule enunciated in the court below unless such pre-
sumption or legal fiction is invoked in aid of violated public
policy.  Speaking for myself, the extension of the rule of non-
enforceability, based as it is upon the maxim *in pari delicto,* to
the case of the state seeking to prevent public injury, seems to
be without the slightest foundation in sound logic or justifica-
tion in right reasoning.  Be this as it may, the fact is that, if
upon neither of these grounds preventive relief may be had by
the state, no combination can be so hostile to the public interests
or so flagrant in its defiance of public policy but that it may
effectively shield itself from such interference on behalf of the
public by the simple device of casting its proposed violation of
public policy in the form of a contract for a self-imposed re-
straint of trade.  I cannot believe that this is the actual state of
our jurisprudence on this vitally important subject.

Concluding, as we do, that the line of reasoning that limits the
court of chancery in all cases involving contracts in restraint of
trade to the single policy of their non-enforcement is funda-
mentally at fault, and that the defendants have not by their vio-
lation of public policy effectually entrenched themselves outside
the pale of preventive law, it remains to be considered whether
certain facts that were merely assumed in the court below, viz.,
that the contract in question is one that fixes rates and stifles
competition and is detrimental to the public, are sustained by
the testimony.  If they are, and if injury has thereby resulted
to the public, the duty of a court of equity to enjoin the defend-
ants from continuing to act under such *ultra vires* contract is
clear.  The contract, without question, fixes and maintains rates
and so controls the placing of insurance and the channels
through which that business flows that it inevitably reduces com-
petition to the minimum if it does not absolutely eliminate it.
This much appears from the contract itself and in the testimony.
The remaining question, viz., that of injury to the public, is not

so much one of disputed fact as of the sufficiency of a proffered justification of an established fact. The marked increase of cost to the insured, coincident with the going into effect of the contract, is a salient and palpable fact that, in the case of any other commodity of equal necessity, would carry its own irrefutable conclusion as to whether or not it was a public injury. The debatable questions are whether such increased price of insurance is not justified and rendered non-injurious to the public—*first,* as being merely incidental to the adoption of means and methods necessary to the proper conduct of the business of insurance, and *second,* whether such increase of premium rates, while immediately burdensome, is not ultimately beneficial to the insured by adding to the solvency of the insurers and swelling the fund out of which indemnity must come in case of loss. The first of these suggestions does not appeal to us for the reason that it is perfectly obvious that everything that is attained by this contract in the way of equipment for the proper conduct of the business of the defendants could be attained by them severally or acting in unison without involving their combination to regulate rates and stifle competition. The masterful way in which these reprobated features of the contract are effectuated forbids us to treat them as mere incidents of a system for the gathering of statistics and the dissemination of data. The other suggestion by which the increase of price to the insured is justified as being ultimately beneficial to him is more persuasive and would probably be entirely so if any substantial warrant for such suggested benefit could be found in the contract. It cannot, however, be found there.

In order that the insuring public be ultimately or at all benefited by the increased cost of insurance it is required to pay, it is essential that such increase over and above the cost of the operation of a company should go not in dividends to its stockholders or in salaries to its officers but to a fund, by whatever name called, by which greater solvency would be given to the company and its increased ability to respond to losses assured. For this, however, there is no provision in the contract. In such cases, *i. e.,* where an increase of earnings results from a contract made by the officers of a company acting for its stockholders, we

must, in the absence of any suggestion to the contrary, deem that such contract was made for the benefit of such stockholders. If, contrary to this normal presumption, the intention in making such contract was that such increased earnings were to go to some fund in which the insured would have an interest, it is so highly probable that a provision of such importance would be mentioned in such contract that the failure so to do forbids us to assume that such an intention existed; it is certain that this contract contains no such provision that the insured can lay hold of or by which the subscribing companies could be bound. We cannot avoid, therefore, the following conclusions: *First,* that the increase of price wrought by this combination of insurers has not been justified; *second,* that such increase works actual injury to the public; *third,* that the contract by which such combination was effected is in restraint of trade and repugnant to public policy on that account, and *fourth,* that it is unreasonable in that it transcends the legitimate purposes for which the defendants were created or licensed and that such combination itself is characterized by all the evils that the common law by its rule against them placed under its condemnation. That the corporate acts by which such contract was entered into and such combination effected and its continuance perpetrated are *ultra vires* the defendants needs no further argument; that the defendants should be enjoined from such continuance follows from what has already been said.

The notion that this conclusion runs counter to anything that was decided by this court in *Raritan Railroad Co.* v. *Traction Co., 70 N. J. Law (41 Vr.) 743,* can rest only upon a misunderstanding of that decision or arise from a failure to read the opinion delivered in that case. The contract there under consideration was one between a railroad company and a traction company by which the former agreed "not to lower its present rate of fare unless required by law." In his opinion, Mr. Justice Pitney (now chancellor) makes it perfectly clear that what was decided was that section 15 of the General Railroad act in terms absolved a railroad company affected by it from the exercise of that judicial discretion respecting rates of fare that otherwise would be addressed to it as an impartial arbiter be-

tween its stockholders and the public and vested in such railroad company an uncontrolled discretion, within the limits fixed by the legislature itself, to establish such rates as its own interests, without regard to the public, might require.   Upon this point the opinion concludes with this language: "Any construction of section 15 of the act that places the railroad company in the attitude of an impartial arbiter as between it and the public, being thus found to be inadmissible because it runs counter to fundamental principles, we have before us a *statutory* scheme which in terms confers upon the company an uncontrolled discretion to subserve its own interests in making and from time to time changing the rates of fare and of freight, subject only to the maximum rates prescribed and to further legislative action from time to time thereafter."   It is clear, therefore, that what was decided was the construction of a statute and its effect in absolving railroad companies from an attitude toward the public that otherwise would exist.   The decision, therefore, instead of militating against our present conclusion is impliedly at least in its favor.   The judges who dissented in the case cited did so because their construction of the statute differed from that of the majority of the court.

The result reached upon either branch of the present appeal is that the decree brought up by it should be reversed and the case remitted to the court of chancery to the end that an injunction may issue in accordance with the specific prayers of the information and the views herein expressed.

SWAYZE, J. (dissenting).

In ordinary cases little good is done by an expression of the reasons for dissent, but when the principle involved is fundamental, it is a public duty to protest in the hope that the logical consequences may not lead us too far before we are aware of the direction in which we are traveling.   This decision is novel. Combinations of insurance companies like the Newark Fire Insurance Exchange are not new.   Many such cases are collected in *Lewson's Monopoly and Trade Restraint Cases,* referred to in the opinion.   It is significant that not one of these cases is cited.   I shall review them at length hereafter.   Our sister

states, administering the same system of law that we administer, have been singularly blind, for they have for years been industriously legislating on this subject, and if the present decision is right, such legislation has been unnecessary since we have accomplished by judicial decision what in every other state has been thought to require legislative action by the elected representatives of the people. I deprecate judicial legislation regardless of its merits. It confuses the functions of the separate branches of the government, and when it results, as in this case, in applying new law to the past conduct of individuals, it has all those evils of *ex post facto* legislation which led to our constitutional prohibition. I deprecate also the ground upon which the decision is put, for it goes much farther and reaches much deeper than the opinion itself indicates. The court relies on *Munn* v. *Illinois*. *Munn* v. *Illinois* was decided under provisions of the Illinois statute which attempted to regulate the charges of individuals owning grain elevators. The importance of the case was in its assertion of this right to regulate charges by private individuals, not corporations. By relying upon that case alone as authority, the court must mean that it is competent for the legislature to fix rates of insurance by private individual insurers, a very wide departure from established principles. It may be conceded that where a virtual monopoly exists, as in the *Munn Case,* the state, by its legislature, has the right to regulate charges. Such is the view suggested by Professor Wyman in a thoughtful article on "The Law of Public Callings," *17 Harv. L. Rev. 156* (at *p. 217*), and it has much to commend it. But the right to regulate charges when it rests upon the existence of a virtual monopoly must cease as soon as the court has destroyed the monopoly by its injunction. Under this view, to put an end to the monopoly is to cut off the branch on which the right of public regulation hangs, and this the court attempts to do by its present decree. The opinion rests for its fundamental proposition not upon the basis of virtual monopoly, but upon the idea that when the public interest is served by the conduct of any business, and that business has become large and successful, the public may at once intervene. The quotation in the opinion,

"First the blade, then the ear, after that the full corn in the ear," and the paraphrase of Shakespere, suggest that one rule applies to a small business and a different rule to a large business. I have never before heard it suggested that the size or success or want of success of a business was a test of its public character. I think a ferryman operating a flatboat with only one passenger a day is engaged in a public calling as truly as the owners of the ferries over the North river with their thousands of passengers daily; that a public expressman just beginning business and carrying his first parcel is engaged in a public calling as truly as the great express companies, and that the railroads were engaged in a public calling in their feeble beginnings as well as in their present development. If size or success is, as the opinion holds, the test by which the existence or non-existence of a public calling is to be determined, I do not know where to draw the line or when in the course of its growth a business that before was private becomes public. The test of size and success is a very different test from that of a virtual monopoly. The opinion holds that the business of insurance is affected with a public interest, not because of the combination, which is to be dissolved, but because it is an important business necessary in modern life. The reasoning applies as well to a single company as to a combination of many companies. In fact the decision goes upon the ground that the court has the right to regulate the business of each separate company because it is affected with a public interest, and to prevent each separate company from making the contract in question. If this is correct, the *Munn Case* is authority for the extension of the same regulation to individual insurers. It is therefore important to determine whether the right to regulate insurance companies, which has long been exercised, rests upon the ground that they are affected with a public interest. The expression "affected with a public interest" is an unfortunate one. Judge Cooley, years ago, in discussing *Munn v. Illinois,* was careful to warn us against the danger of giving too broad a meaning to these words. *Cooley Const. Lim. 736.* He says:

"The mere fact that the public have an interest in the existence of the business, and are accommodated by it, cannot be sufficient, for that would subject the stock of the merchant, and his charges, to public regulation. The public have an interest in every business in which an individual offers his wares, his merchandise, his services, or his accommodations to the public; but his offer does not place him at the mercy of the public in respect to charges and prices."

He then proceeds to explain *Munn* v. *Illinois* as resting upon the virtual monopoly, the very condition which the present decree undertakes to destroy, and he classifies businesses which are affected with the public interest as follows:

"1. Where the business is one the following of which is not of right, but is permitted by the state as a privilege or franchise. Under this head would be comprised the business of setting up lotteries, of giving shows, &c., of keeping billiard tables for hire, and of selling intoxicating drinks when the sale by unlicensed parties is forbidden; also the cases of toll bridges, &c.

"2. Where the state, on public grounds, renders to the business special assistance by taxation or otherwise.

"3. Where, for the accommodation of the business, some special use is allowed to be made of public property or of a public easement.

"4. Where exclusive privileges are granted in consideration of some special return to be made to the public."

The business of insurance against fire is said to come within these classes because it is regulated by the state, and companies which cannot satisfy a certain standard of solvency and comply with certain conditions are not allowed to do business in the state. It sounds rather strange to find that the burdens and requirements imposed by forty-six different states, from which insurance companies have made vain attempts to escape since the decision of *Paul* v. *Virginia,* are really in the nature of privileges and franchises because they exclude from competition all companies which cannot attain to the legislative standard or comply with the legislative conditions. These regulations might indeed amount to privileges and franchises if the state bound itself not to relax them or not to admit other companies on less onerous terms; but there can be no privilege or franchise where the state grants nothing; the restriction of competition by means of these salutary regulations does not amount to an agreement on the part of the state to continue them. The legislature

may to-day adopt regulations which would require a company to have a capital of a million dollars, and after the companies that could do so, had complied, perhaps with great difficulty, with the legislative requirements, those requirements might be reduced and the companies with large capital would have no redress. Indeed, the legislature, far from making these regulations amount to the grant of a special privilege, has taken pains to provide for insurance on the mutual plan and for the formation of associations known as Lloyds (*P. L. 1896 p. 156*), under which any twenty men of sufficient substance may insure as individuals. The state has been careful not to grant special privileges to what are called the old line insurance companies, such as are concerned in the present case, but has only imposed regulations and restrictions necessary to insure solvency. It is true that the companies having a New Jersey charter have a privilege and franchise, and that the companies of other states that are admitted to do business in this state, may also properly be deemed to acquire a privilege by that permission, and I do not deny the state's power of regulation arising from these facts; but that power rests upon the reserved power of the state to control its own corporations, and upon its absolute power to admit or refuse to admit foreign corporations to do business in the state. It does not rest upon the view that these particular corporations, known as insurance companies, are peculiarly constituted and peculiarly affected with a public interest. Under this power the legislature has the right to amend the charters of corporations, at least those which have received their charters since the enactment of the act of 1846, which now appears as section 4 of the Corporation act, a class which probably includes all of the defendants in this case (although their charters have not been put in evidence) ; and it has the right to impose additional conditions upon foreign insurance companies. But the right to regulate the business of corporations is very different from the right to regulate the business of individuals. Corporations come within the first of Judge Cooley's classes, but individual insurers, who, under the form known as Lloyds, have become important in England, and may become important here, do not exercise their business as one of privilege, but as one of constitutional

right, by which they may acquire property, and if they are to be regulated at all, are to be regulated by virtue of the police power just as the practice of medicine and law may be regulated since the decision of *Dent* v. *West Virginia*. The distinction is important; for the police power and the power to regulate corporations must be exercised by the legislature; and our legislature has significantly failed to act.

The remedy for the evils supposed to be due to the compact now condemned by the court has been in the hands of the legislature ever since the Newark Fire Insurance Exchange was formed in 1902. It was simple and required no litigation to establish its efficacy, but the legislature has failed to prescribe any additional requirements, and, as far as the foreign companies are concerned, has allowed the superintendent of insurance to renew their licenses in each successive year. It is not for the court to add to the legislative requirements. Such has been the holding of this court with reference to the statutory signals required to be given by railroads; and I think our decision in that respect is applicable to the present situation. The reason the legislature has failed to act is probably the same reason which led the legislature of Missouri, in passing a statute against combinations of this character, to exempt from the operation of the act cities of more than one hundred thousand inhabitants. *State* v. *Firemen's Fund, 52 S. W. Rep. 595*. It has a solid basis in the greater fire hazard in the larger and more compactly built cities, many of which are built of frame structures and consist of extraordinarily hazardous risks, where regulations such as those of the Newark Fire Insurance Exchange are peculiarly desirable for the public safety. The failure to exercise the legislative power to forbid the present arrangement is conclusive evidence that, in the view of the legislature, it was not inimical to the public interest. There is no reason why the legislature should not have exercised this summary and extreme power which is not applicable to the exercise of the same power by this court. For us to decide that this business has been continued illegally for all these years is to suggest that the legislature has failed in its duty. I cannot believe that that accusation is just.

The distinction between the power of the legislature to control corporations and the control by the courts upon the ground that the business is affected with a public interest is an important one in its effects, aside from its application to individuals. One of the most important characteristics of a business affected with a public interest is that those engaged in its conduct must serve all who come, just as the innkeeper or a ferryman or a common carrier must, and it would be quite impossible to hold that this prominent and essential characteristic of a business affected with a public interest applies to an insurance company. The court, in its opinion, shrinks from so holding. An insurance company is certainly at liberty to reject absolutely and without assigning a reason, risks which are too hazardous to be insured at all, or in which experience has failed to establish a basis for rates of premium, or in which the moral hazard is bad. In such cases the insurance company must decline to insure if it is to hold itself ready to pay natural losses to honest insurers. The fact that the insurance companies cannot, if the business is to be successfully conducted, insure all who offer, is itself enough to show the error into which the court has fallen in holding that the business is one affected with a public interest.

The definition given by the court to the expression "affected with a public interest," loses sight entirely of the distinction upon which the cases rest. All of them go back to what Lord Hale says in the passage quoted in *Munn* v. *Illinois*. The right to regulate ferries was put upon the ground that they were really a part of a public highway. As to a wharf or crane, Lord Hale says, that a man may set up one and take what rates he and his customers can agree upon, "for he doth no more than is lawful for any man to do, viz., makes the most of his own;" but he adds, "when the wharf is one to which all *must* go, because it is the only wharf licensed by the queen, or because it is the only wharf at the port (as it may fall out where a port is newly erected), then arbitrary and exclusive charges cannot be taken." This is the view that Professor Wyman advocates in the article referred to, and puts the right to regulation upon the more tenable ground of a virtual monopoly, not upon the size or success of the business. It is the necessity of public regulation in such

cases that justifies what would otherwise be an unwarrantable interference with a private business. Whether there can be a virtual monopoly of mere contracts of pecuniary indemnity or not, it is reasoning in a circle to say that because a combination becomes affected with a public interest by reason of its being a virtual monopoly, we can destroy the monopoly and still retain the quality of being affected with a public interest. It is hard to see how the business of insurance can become a virtual monopoly, since, under the decision in *Allgeyer* v. *Louisiana,* it is open to all the world regardless of state regulations so long as the contracts are not made in the state, and even such monopoly as exists by virtue of the legislative restrictions upon the business is created by the legislature itself, which has found it wise to restrict the business to certain companies and individuals in the public interest.

*Munn* v. *Illinois* has been frequently reviewed, but the diligence of counsel and of this court and my own researches have failed to reveal any case before this in which it has been held that the fact that a business was successful and that it was a useful or necessary adjunct of modern society was sufficient to bring it within the purview of that case. *Budd* v. *New York* certainly explained the earlier case on the view I suggest, and I do not know what other test is to be adopted unless we include all useful employments in the class. It must not be overlooked that what *Munn* v. *Illinois* decided was, that the charges of individuals might be regulated where their business was affected with a public interest. I think the upright lawyer or even the skillful advocate are essential to the conduct of a civilized society, and no one would deny the absolute necessity for the proper care of human life by the skillful physician and surgeon. Logically the court must hold that as soon as the lawyer or advocate, the physician or surgeon, becomes so skillful that his services are of the utmost value, then the practice of his profession becomes affected with a public interest, and his fees for a skill which may be quite unique become the matter of public regulation. I cannot conceive the court carrying the reasoning of the opinion to the logical end, but where it is to stop I do not know. I think, therefore, that the court fails in its first proposition that the

business of insurance is affected with a public interest within the meaning of the cases. The cases in which a similar result has been reached have been under statutes of the different states. *State* v. *Firemen's Fund, 52 S. W. Rep. 595; Hartford Fire Insurance Co.* v. *State, 89 S. W. Rep. 42; State* v. *Phipps, 31 Pac. Rep. 1097. People* v. *Sheldon, 34 N. E. Rep. 785,* was not an insurance case, but that also arose under a statute. In states which, like New Jersey, have no statute, a different result has been reached. Thus, in *Aetna Insurance Co.* v. *Commonwealth, 51 S. W. Rep. 624,* the Kentucky court held that contracts regulating insurance were not within a statute prohibiting combinations to regulate, control or fix the price of any merchandise, manufactured articles or property of any kind, and that a combination for the purpose of maintaining rates of insurance, although it might be a void contract, was not an indictable offence at common law. The indictment in that case was for conspiracy to stifle free competition among fire insurance companies and their agents. And in *Queen Insurance Co.* v. *State, ex rel. Attorney-General, 24 S. W. Rep. 397,* the Texas court held that the Texas statute did not apply to insurance, and that a combination of fire insurance companies to fix uniform rates and agents' commissions, though possibly unenforceable as an unreasonable restraint of trade at common law, was not enjoinable by the public, nor a ground for forfeiting franchises, "since the business is not one in which the public has an interest as in that of a common carrier or other corporation having the power of eminent domain, or of a dealer in a staple which is a prime necessity of life; nor is it a professional service to which the public is entitled."

In *Continental Insurance Co.* v. *Board of Fire Underwriters, 67 Fed. Rep. 310,* Mr. Justice McKenna held that a board of fire underwriters formed under an agreement providing for the regulation of premium rates, the prevention of rebates, the compensation of agents and non-intercourse with companies not members, was not an illegal conspiracy, and the accomplishment of its purpose by lawful means would not be enjoined at the instance of a company not a member of the association. In *Liverpool, London and Globe Insurance Co.* v. *Clunie, 88 Fed. Rep.*

*160,* Circuit Judge Morrow held that the fact that a number of foreign insurance companies doing business in the state were members of an illegal combination to suppress competition, would not prevent them from maintaining a suit to enjoin the state insurance commissioner from illegally revoking their certificates to do business, and he quoted the *Continental Insurance Company Case* above cited as deciding that the association was lawful and its purpose legal. It will thus be seen that in the cases in which a similar question has arisen, where there was no statute, the courts have uniformly reached a result different from that now entertained by this court. No one would deny the high standing of Mr. Justice Harlan, the senior judge in service of the United States supreme court. In his concurring opinion in *Carroll* v. *Greenwich Insurance Co., 199 U. S. 401* (at *p. 414*), he touched upon this subject, and his language shows that he was fully sensible of the very considerations now expressed in the opinion of this court, but instead of suggesting that the matter could be controlled upon common-law principles in the manner that we now adopt, his language shows that he evidently thought that the way to reach it was by legislation. He says: "The business of fire insurance is of such a peculiar character, so intimately connected with the prosperity of the whole community, and so vital to the security of property owners, that it is competent *for the state* to forbid combinations and agreements among fire insurance companies doing business within its limits in reference to rates, agents' commissions and the manner of transacting their business. If, *in the judgment of the state,* the people who desire insurance upon their property are put at a disadvantage when confronted by a combination or agreement among insurance companies, I do not perceive any sound reason why, preserving the individual right of contracting, it may not forbid such combinations and agreements, and thereby enable the insured and insurer to meet on terms of equality. Surely *the state could enact* such a regulation with reference to companies organized under its own laws. If that be so, it cannot be that such regulation may not be made applicable to foreign insurance companies doing business in the state only by its consent." The control of corporations by state enactment, as

Justice Harlan suggests, is a very different thing from action by the court where the state, through its authorized agents, has persistently for years failed to act.

There are cases where agreements in restraint of trade of this kind have been denounced, but in every case the only remedy has been supposed to be for the court to refuse to enforce the agreement. The reason is not far to seek. If the parties to an agreement are all satisfied with it, and find it to their interest to conduct their business in harmony and without competition, no power can prevent them from doing so short of the absolute prohibition of the business. The courts cannot make men compete who are determined not to compete. If, however, they are not satisfied with the agreement, and do not desire to conduct their affairs in harmony, but prefer to compete, the agreement will not stand in their way as long as the courts refuse to enforce it. An injunction is either *brutum fulmen,* or is unnecessary. A similar question arose in *Meredith* v. *Zinc and Iron Co., 55 N. J. Eq. (10 Dick.) 211* (at *p. 221*), where Vice-Chancellor Pitney held that the buying up by one corporation of the property of another, and consolidating the whole into one business to the extent and in the manner provided for in the agreement there in question, was not contrary to public policy, nor did it tend to create a monopoly; and he added:

"By the law of the land these owners have the right to exercise their own judgment as to when, if ever, and how they will spend their money in preparing their property for market and rendering it fit for use by mankind. Now, I am unable to find any foundation either in law or in morals for the notion that the public have the right to have these private owners of this sort of property continue to do business in competition with each other. No doubt the public has reasonable ground to entertain the hope and expectation that its individual members will generally, in their several struggles to acquire means of comfortable existence, compete with each other. But such expectation is based entirely upon the exercise of the free will and choice of the individual, and not upon any legal or moral duty to compete, and can never, from the nature of things, become a matter of right on the part of the public against the individual. In fact, the essential qual-

ity of that series of acts or course of conduct which we call competition is that it shall be the result of the free choice of the individual and not of any legal or moral obligation or duty."

The control of the supply of zinc ore necessarily limited to the already existing natural deposits, is undoubtedly as important for the public as a partial control of the moneyed capital of the world, which is limited only by the wealth of the world and is constantly increasing in amount. The *Meredith Case* was affirmed by this court on the opinion of Vice-Chancellor Pitney, *56 N. J. Eq. (11 Dick.) 454.*

Twenty years ago we had occasion to consider a question similar to that which arose in *Munn* v. *Illinois.* The Delaware, Lackawanna and Western Railroad Company filed a bill to compel the Central Stockyard and Transit Company to receive cars containing livestock, and Vice-Chancellor Van Fleet recognized that the case was similar to *Munn* v. *Illinois;* in fact, the stockyard in that case was the only place in Jersey City to which the railroad could deliver livestock. *Delaware, Lackawanna and Western Railroad Co.* v. *Central Stockyard and Transit Co., 45 N. J. Eq. (18 Stew.) 50* (at *p. 61*). Vice-Chancellor Van Fleet said: "The part of the opinion of the majority of the court which is most pertinent to the question now under consideration is that in which it is said: 'It matters not in this case that these warehousemen had built their warehouses and established their business before the regulations complained of were adopted. What they did was, from the beginning, subject to the power of the body politic to require them to conform to such regulations as might be established by the proper authority for the public good.' From this statement of the law, it would seem to be undeniable that *until the proper public authority intervenes and establishes such regulations as it may deem necessary for the public good,* the owners of property devoted to a public use of this character retain complete and absolute dominion over it, and may exclude any part of the public from its use that they see fit. Until the body politic puts in exercise its power to control the use of such property, its owner may use it as he pleases."

He adds: "That the duty to receive the livestock did not rest upon the stockyard by force of any general rule of law, and the court to sustain the complainant's claim must be able to find evidence of an intention on the face of the statute so clear and strong that it may, *without fear of usurping legislative power,* declare that such intention is part of the legislative will."

This opinion was approved in this court, where the decree was affirmed without further reasoning. *46 N. J. Eq. (1 Dick.) 280.* Justices Dixon and Magie dissented, but upon the ground that the charter of the stockyards required the business to be located upon public navigable waters near the terminus of great trunk lines of railroad, and gave them power to build railroads, to lay tracks across public streets, and invested the company with authority to make police regulations, the violations of which would subject the offender to arrest without warrant and to fine and imprisonment, and expressly declared that the business of the company should be that of a general stockyard; they laid stress upon the use of the word "general." The dissenting justices recognized that it followed as a' necessary consequence that the company was bound to deal with all members of the community impartially and on reasonable terms. This is, indeed, a necessary consequence of a public employment, and the very fact that it is inapplicable to insurance companies is conclusive that they are not a public employment within the definition. The reasoning of the present case goes contrary, therefore, to two express decisions of this court, and is unwarranted, as far as I know, by any case in any other jurisdiction. No such case is cited. If, therefore, it is necessary, as the opinion says, in order to sustain the conclusion of the court, to hold that the business of insurance is a public employment, the basis upon which the result is reached fails.

The contract is said, however, to be *ultra vires* because it amounts to a delegation by the board of directors of the right and duty to manage the affairs of the corporation. I think it is unnecessary to discuss the general question as to the extent to which the board of directors may delegate to others the execution of acts for the corporation. Obviously, a very large portion of the acts of a corporation must necessarily be done by sub-

ordinate agents, and I understand that the rule is that the duty of the directors is only to exercise a general supervision and direction of the affairs of the corporation. *Morawetz Corp.* § 536. This case does not amount to a delegation of authority at all. It is merely an agreement by the constituent companies that they will not issue insurance in Newark at less than the rates established by the exchange. I know of no provision of law, nor is any pointed out in the opinion, which requires any one of these insurance companies to issue any insurance whatever in the city of Newark. As far as appears, all of them are at liberty to decline risks in the territory covered by the exchange. Certainly the foreign companies are under no legal obligation to issue insurance in that locality. If they are free to refuse to issue insurance at all, they must *a fortiori* be free to refuse to issue except at certain rates. By the agreement the constituent companies do not bind themselves to issue insurance policies at the rates fixed by the exchange, but merely not to issue them at any lower rates. The power of the directors to manage the affairs of the company, no doubt, includes the determination of the question whether or not the company will issue any particular policy or assume any particular risks, or will do business in any particular place, and it is no abdication of power to decline the business except upon certain terms. It is rather an exercise of the power of general supervision and direction. It is no more an abdication or delegation of power to refuse to issue policies in Newark except at certain rates, than it would be to refuse to issue policies at all in San Francisco. Since the companies are free to decline all risks, I do not see any logical reason why they may not agree in advance upon the rates at which they will accept the risks. In substance, what the insurance companies say is this: "The exchange will establish rates; if we choose to do business in Newark at all, we will do business at those rates, but it is still open to the companies to accept or decline any particular policy." But for the respect which I entertain for my brethren, I should think it absurd to say that an agreement not to do, except upon certain conditions, what they are at liberty not to do at all, amounts to a merger of the companies. In fact, as the insurance business is conducted, the

question of premium rates must necessarily be left to skilled underwriters familiar with the conditions in the particular locality. All of these companies probably do business in many different localities in many different states, under widely varying conditions of hazard. It is quite impossible for any board of directors actually to determine the rates in any particular place, and that is not their function, but the function of professional underwriters. Again, the value of property has become so great that perhaps a majority in amount of the insurance issued is upon risks which cannot be assumed by one company alone, without exposing its assets to undue hazard and putting too many eggs in one basket; consequently, the practice has grown up of insurance companies uniting and each writing a part of the amount on the same risk. It must be that companies have the right to agree upon the rate on such risks, and if they have the right to agree, they certainly have the right to agree to insure at a rate to be fixed by a skilled underwriter, for a whole city. This is no delegation of the actual function of the directors, which is to make contracts, and not to determine rates. The agreement does not give to any one company any control over the assets and management of another. It merely establishes a convenient way by which uniform rates may be determined, leaving each company free to accept or decline the risk as it chooses, and to manage its own affairs.

The case of *Stockton* v. *Central Railroad Co.* is an illustration of an *ultra vires* act restrained at the suit of the attorney-general. But Chancellor McGill expressly put the case upon the ground that the lease there in question was made, not only without legal sanction, but in defiance of an express prohibitory statute. *50 N. J. Eq. (5 Dick.)* 78. This case would be analogous to that if the legislature had enacted a statute forbidding contracts like the present. The failure of the legislature to do so is, as I have already suggested, in effect, a legislative permission.

It is said that the contract is illegal because it is in restraint of trade, and the argument is that the state must have power to restrain corporations from entering into any illegal contract. It has been decided in this state, after most mature consideration,

that contracts in restraint of trade are not necessarily illegal. *Trenton Potteries Co.* v. *Oliphant, 58 N. J. Eq. (13 Dick.) 507.* We have recently reaffirmed this view in *Fleckenstein Brothers' Co.* v. *Fleckenstein, 71 Atl. Rep. 265.* Even under the federal Anti-Trust act of 1890, Mr. Justice Brewer, who had concurred with the majority of the court in the early case of *United States* v. *Freight Association, 166 U. S. 290,* said, in his concurring opinion in *Northern Securities Co.* v. *United States, 193 U. S. 360,* that the ruling in that case, instead of holding that the Anti-Trust act included all contracts, reasonable or unreasonable, in restraint of interstate trade, should have been that the contracts there presented were an unreasonable restraint of interstate trade, and as such within the scope of the act. From the very earliest times contracts in restraint of trade, when limited to a particular locality or to a particular time, have been treated as valid. Such is the contract in the present case. It is limited to the city of Newark and the immediately adjacent towns coming within the same fire risk, and it is limited in time, because any of the companies may withdraw from the agreement upon thirty days' notice. I doubt if a case can be found where a contract thus limited in time and place has been held to be an illegal restraint of trade. If I am wrong in that, an examination of the contract itself indicates its real object. That object was twofold—*first,* to prevent rebating by agents of the insurance companies, and *second,* to adopt concerted measures to decrease the fire risk. It is probable that there would be little difficulty in the companies themselves agreeing upon rates of insurance. The difficulty is shown to have arisen from the fact that the agents of the companies were allowed a commission on the premiums and were enabled, by means of surrendering a portion of their commission by way of rebate to the assured, to compete not only with each other, but to compete even with the companies they represented, and to write insurance at lower rates than the company itself offered over its counter. We have been at pains in this state to pass an act making it criminal to allow rebates from the premium in the case of life insurance, and the federal government during the last few years has made strenuous efforts, by means of legislation and litigation, to prevent

what has been considered the evils of rebating in interstate commerce. The evil, of course, is that one man is enabled, by his greater skill or influence, to secure service at a lower rate than his neighbor. It seems to have been considered by our legislature in the case of life insurance, by the federal government in the case of contracts of carriers, that uniformity of rates was even more desirable than low rates. I cannot think that it is illegal for fire insurance companies to attempt to prevent, by common agreement, what the legislature in the case of life insurance companies has made criminal by statute. It even seems meritorious. It was practically conceded at the argument that this was the real complaint of the attorney-general, and that it was not that the rates fixed by the companies were extortionate, but that the agreement was so drawn as to prevent any discount from those rates to favored insurers. Another prime object of the agreement was to secure improvement in the fire hazard by allowing deductions from the premium in case various precautions were taken by the assured. The natural tendency of this effort by the concerted action of the companies to decrease the fire loss is not detrimental to the public, but, on the contrary, beneficial; and there is no reason to doubt the evidence, which was uncontradicted, that the rates of insurance in the United States are less in states where compacts of this kind exist than in states where such compacts do not exist. It was proved that this laudable effort to decrease fire loss could not be accomplished except by the concerted action of the companies and an agreement upon rates. It may be true that such an agreement also has a tendency to maintain rates, but every agreement by which two men unite and conduct their business together, instead of competing one with the other, has the same tendency, and while an agreement, the only object of which was to stifle competition, might well be declared illegal, it is going much farther to hold that an agreement, the main object of which is for proper purposes beneficial to the public, becomes illegal because, as an incidental result, it may by possibility tend to prevent competition. The proof in the case shows that the rates in Newark are lower than in most places, and there is a total failure to show that the rates are more than enough to make good the losses insured against, pay the

expenses of conducting the business, and a reasonable return upon the capital invested. The evidence shows that in some localities nearby, where rates are lower, the business has been conducted at a loss. Indeed, the complaint at the original argument was not that the companies were making unreasonable profits on their whole business, but that they were using profits made in Newark to recoup losses in San Francisco. This argument overlooked the whole theory of insurance, which is to distribute the hazard. It is for the public benefit that the business should not be conducted at a loss, for insolvency sooner or later is the necessary consequence, and it is to the public interest that men who invest their money in the business of insurance against loss by fire should be compensated by a proper return, for otherwise there would be no inducement to engage in this highly useful employment, which serves the admirable purpose of distributing through society at large the shock of the loss by fire which might prove ruinous to any single man or association. It is said that there is no provision in the contract which requires the company to set aside any portion of the premium in order to increase the security of the assured, but the desire of the companies for the continued successful conduct of their business is sufficient motive to accomplish this end. We must assume that the companies are honestly managed with a view to a continuance in business (as is the ordinary case), and that they will be careful not only to comply with the law but to lay aside, as most of them do, except in cases of unexpectedly great conflagrations, a sufficient surplus to meet the unusual hazards of the business.

The question, however, seems to be entirely set at rest by the decision in this court, in the case of *Raritan River Railroad Co.* v. *Traction Company,* 70 *N. J. Law* (*41 Vr.*) *732, 743.* There a railroad company agreed with a traction company, which paralleled its line, that during a limited period the railroad company would not reduce its present rates of fare unless required by law. It was held that this agreement was valid and not contrary to public policy as established in this state. I fail to see how an agreement between common carriers, everywhere conceded to be engaged in a public calling, which is intended purely for the purpose of preventing competition, is

valid where the right of the company is limited to a maximum rate fixed by law, and an agreement which has merely a tendency to prevent competition as a mere incident of lawful purposes, becomes invalid when the company is not limited by any maximum, but is free to charge any rate that it pleases. The case seems stronger to me in favor of the validity of an agreement in the latter case, where the company is unhampered by restrictions of statute. The legislative permission in the Railroad act is not to charge three cents per mile absolutely, but such rate as the company shall think reasonable and proper, provided it is *not more* than three cents per mile. So, in this case, the companies are entitled to charge such rates as are reasonable and proper without any limitation, except by the court, which upon the theory of the opinion would be entitled to determine what are reasonable and proper rates. What difference in principle can there be between an agreement to prevent competition where there is a fixed statutory limit which cannot be exceeded, and a similar agreement where the limit is what the court determines to be reasonable and proper? The fact that the Railroad act authorizes the company to charge what it thinks reasonable and proper does not alter the case, for insurance companies also may charge such rates as they think are reasonable and proper. In the case cited, competition between two common carriers was absolutely stopped by the agreement which we said was valid. In neither case is the question of the reasonableness and the propriety of the charges within the control and discretion of the company; that is, in case the insurance companies are subject to judicial regulation in this respect, as is the necessary result of this decision. If the case is to be distinguished it can only be upon proof that the rates charged in the present case were unreasonable and improper, and there is an entire failure of such proof. The opinion of the court does not venture to suggest that the rates are higher than are required to pay losses, the expenses of conducting the business, and a reasonable profit; that is, higher than suffices to induce men to enter the business of insurance and to maintain solvency.

Even if the contract were invalid, I agree with the learned vice-chancellor that the only effect is that it is unenforceable. It is

sufficient to justify that view to quote from the famous opinion of Judge Taft, upon which the learned vice-chancellor relied. *United States* v. *Addyston Pipe and Steel Co., 85 Fed. Rep. 271.* The court said that contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal or giving rights to a civil action for damages in favor of one prejudicially affected thereby, but were simply void and were not enforced by the courts, and that the effect of the act of 1890 (the act of congress to protect trade and commerce against unlawful restraints and monopolies) is to render such contracts unlawful in an affirmative or positive sense and punishable as a misdemeanor, and to create the right of civil action in damages in favor of those injured thereby, and a civil remedy by injunction in favor of both private persons and the public against the execution of such contracts and the maintenance of such trade restraints. Judge Taft, in this passage, distinctly calls attention to the fact that the civil remedy by injunction was introduced into the federal jurisprudence by the act of 1890, and that it did not exist at common law. If this decision is good law—and no one questions it—there is no remedy by injunction in this state, for the reason that we have no such statute. Courts of equity do not issue injunctions unless for the purpose of preventing irreparable injury. Such a result cannot be had by this injunction. If the companies choose to continue the present rates, the injunction cannot prevent them. If they do not choose to do so, the compact is no obstacle. The only probable effect of this decision is to make it difficult for the companies to prevent rebating by their agents. The question of the public policy of rebating is outside my province; it is for the legislature and not for the court. I am unwilling to assent to judicial legislation; I prefer to stand by the more stable landmarks of established law.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, REED, BERGEN—4.

*For reversal*—THE CHANCELLOR, GARRISON, TRENCHARD, BOGERT, VREDENBURGH, VROOM, DILL—7.