91 N.J. Super. 202 (1966)
219 A.2d 635
RUDOLPH GRILLO, TRADING AS SOMERSET REAL ESTATE CO., PLAINTIFF,
v.
THE BOARD OF REALTORS OF THE PLAINFIELD AREA, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 27, 1966.
*206 Messrs. Shavick, Thevos, Stern, Schotz & Steiger, attorneys for plaintiff (Mr. Howard Stern, appearing).
Messrs. Abrams, Kestenbaum & Hendricks, attorneys for defendant Board of Realtors (Mr. Norman J. Abrams, appearing, assisted by Mr. C. Douglas Reina).
Messrs. Feuerstein & Sachs, attorneys for individual defendants (Mr. Harold Feuerstein, appearing).
HERBERT, J.S.C.
Plaintiff Rudolph Grillo is a real estate broker licensed by the State of New Jersey under N.J.S.A. 45:15-10. Since July 1958 he has been the proprietor of his own real estate brokerage business in Plainfield, trading as Somerset Real Estate Co. He alleges that defendants, who are The Board of Realtors of The Plainfield Area, Inc. (the Board) and its member firms, are engaged in illegal practices. He demands a judgment declaring the Board to be an unlawful combination in restraint of trade and declaring its constitution, by-laws and rules and regulations relating to the multiple listing system which it conducts to be contrary to public policy and invalid. He seeks injunctive relief against continuation of the allegedly wrongful practices and, in addition, asks for compensatory and punitive damages.
Plaintiff is not a member of the Board. For a time prior to 1958 he was affiliated with the Board, but only as an employee of a Board member. During the last eight years he has submitted several applications for membership, but each time he has been rejected. He does not demand a judgment compelling the Board to admit him, but he does assert that its restrictions upon membership are an important element in the success of those business methods which he says are illegal and harmful to him and to other licensed brokers who are not members of the Board.
The defendant Board was organized under Title 15 of the Revised Statutes as a nonprofit corporation. It is a "Member Board" of the National Association of Real Estate Boards *207 and is affiliated with the New Jersey Association of Real Estate Boards. The membership of the Board includes the great majority of active real estate brokers and salesmen in the territory of the Board. The jurisdiction of the Board, as approved by the national organization, covers portions of Union, Middlesex and Somerset Counties, including all of Plainfield, North Plainfield, Dunellen, Scotch Plains and Fanwood.
The Board has several classes of members, but only the "Active" class is important for present purposes. Art. III, § 2 of the Board's revised constitution sets out qualifications for "active" membership as follows:
"Active Members shall be brokers duly licensed by the State of New Jersey, who as principals, partners, corporate officers or trustees, are engaged principally in buying, selling, exchanging, renting or leasing, managing, appraising or financing Real Estate for others for compensation, whose principal place of business is located in the territory of the Plainfield Real Estate Board, as approved by the State and National Association of Real Estate Boards. Any individual having the above qualifications shall be eligible for active membership.
An applicant for Active Membership shall be required to have been for at least one year immediately preceding the date of application, a principal, partner, corporate officer or trustee with the office with which he is associated at the time he applies for membership (said office being in the territory of The Board of Realtors of The Plainfield Area); except in the case of an applicant who for the preceding two (2) years has been associated with a Plainfield Realtor as principal, partner, corporate officer, trustee or salesman with Salesman's Membership in the Board."
An applicant for "active" membership is required to fill out and sign a printed form which calls for considerable information about himself. He must furnish the Board with the names of three Board members to whom the Board may refer and three additional business references. The form must be accompanied by a check for $1,000 to pay the stipulated initiation fee. In the form is an express promise by the applicant to abide by the Board's constitution, by-laws and rules and regulations, and the Code of Ethics of the National Association of Real Estate Boards.
*208 The procedure to be followed when an application for membership is received is provided by Art. IV, § 4 of the Board's constitution:
"* * * Upon receipt of an application for Active Membership, the Membership Committee Chairman shall advise the Board of Directors of the name of said applicant, who shall be voted upon by the Board at a meeting no sooner than sixty (60) days from receipt of said application. During this sixty (60) day period any Member of the Board may contact the Membership Committee to convey any information relative to the applicant. The Board Secretary shall within five (5) days of receipt of said application notify the Chairman of the Membership Committee who in turn within five days shall hold a meeting of his Committee and said Committee shall within thirty (30) days of such meeting, complete its investigation of and interview with the applicant and shall file a written report of its findings together with its recommendation to the Executive Committee. The Executive Committee shall consider the application within five days of receipt of report from the Membership Committee and if approved, the Secretary shall notify the active members as to the meeting at which the application will be voted upon. The applicant shall be advised in writing of the decision of the Board by the Board Secretary immediately upon the determination of such decision."
Although this quotation indicates an application can come to a vote by the members only after being approved by the executive committee, there is testimony in the record to the effect that the Board, recently at least, has eliminated the veto power of the executive committee.
An applicant is elected to the Board "when his written application has received the affirmative vote of a majority of the Board of Directors present * * *." The "Board of Directors" is defined by Art. VII, § 1 as "the elective officers and all active members of the Board."
The Board operates a service for the multiple listing of properties for sale. The function of this is to expose the listings obtained by each Board member to the sales efforts of every other Board member.
The Board has adopted official multiple listing rules and regulations. With minor exceptions any listing of a property for sale with a member of the Board must be by a standard form of agreement which gives to the listing broker and "all *209 active Realtor members of the Plainfield Real Estate Board the exclusive right to sell." A member who has obtained a multiple listing agreement from an owner is required to file that agreement within 24 hours in the multiple listing office maintained by the Board. The staff of that office then sends out information about the listed property and the terms of listing to all Board members. Every member and his sales staff then has knowledge that the particular property is being offered for sale and may offer it to prospective buyers.
A member who secures a listing is given discretion to choose between an exclusive or multiple one only if the property involved is a real estate development consisting of five or more individual dwelling units, a single structure containing five or more dwelling units, or a commercial, industrial or "management" property. There is an express provision that no property other than the exceptions just mentioned "may be exclusively listed by a Realtor member without prior approval of the Multiple Listing Committee." The rules and regulations state that commissions on the sale or rental of a multiple listing "must" be divided as follows: listing realtor 20%, selling realtor 75% and multiple listing service 5%.
Section 7 of the rules and regulations before February 1963 provided:

"Commission Agreement With Non-Members
(A) There shall be no cooperation with non-members located within The Board of Realtors of The Plainfield Area Territory on Multiple Listed properties.
(B) Multiple listed property within the Plainfield Area Board territory can only be shown and sold by Plainfield Area Board members. However, Realtors and brokers and other licensees outside the Plainfield Area Board territory can send or refer their prospects to any Plainfield Area Board member. In the event a sale is consummated and a commission paid, the Plainfield Area Board member effecting the sale and receiving the commission shall be obligated to pay 30% of the commission received to the sender."
On February 21, 1963 this section was amended to make it possible for local nonmembers to refer their "prospects" to members of the Board:
*210 "Rule 7A  There shall be cooperation with non-members located within the Board of Realtors of the Plainfield Area on Multiple Listing properties.
Rule 7B  Multiple Listed property within the Plainfield Area Board can only be shown and sold by Plainfield Area Board Members. However, Realtors and brokers and other licensees within and outside the Plainfield Area Board territory may send or refer their prospects to any Plainfield Area Board Member. In the event a sale is consummated and a commission paid, the Plainfield Area Board Member effecting the sale and receiving the commission shall be obligated to pay thirty (30) per cent of the net commission received by the Selling Realtor (net commission is the amount after the Multiple Listing fee and the Listing Realtor's commission are deducted. This will also apply where it is the Selling Realtor's Multiple Listing.)."
Some witnesses testified that there was actually some participation on this limited basis with local nonmember brokers. However, the Board's edict against the showing of multiple listed homes by nonmember brokers was enforced. In 1962 a notice was sent to Board members in the name of the Board's president. It gave the text of section 7, as it then read, and closed with this warning:
"WE KNOW THAT Multiple Listings are being shown by local non-members. Any Realtor doing this is in violation of our rules. Any infringement will be dealt with severely."
In one instance, a member was fined $500 for permitting a local non-member to show and sell a multiple listed home. Concerning that incident the following entry appears in the minutes of the Board's executive committee for May 27, 1964:
"Infraction of Multiple Listing Rules a serious one Protect Home Rule and prevent leakage to outsiders If transaction does not go through, there would be no penalty  therefore, fine $500."
If every licensed real estate broker in the Plainfield area could become a member of the Board for the asking, no nonmember would have cause for complaint about being excluded from the benefits of the multiple listing service. Anderson v. United States, 171 U.S. 604, 616-618, 19 S.Ct. 50, 43 L. *211 Ed. 300 (1898). However, from what has already been said it will be clear enough that restrictions upon admission to membership do exist. Several applications for membership, in addition to that of plaintiff, have been voted down; one, I am sure, because the applicant was a Negro. There is also the very substantial initiation fee of $1,000. The size of the fee is itself a restriction upon membership. There is a strong inference that the amount has been set as a barrier against applications which would otherwise be filed. No showing was made by the Board that such a fee bears any reasonable relation to the cost of admitting a new member. Hurdles are placed, too, in the way of newcomers. Art. III, § 2 of the Board's constitution (quoted above) fixes a waiting period of one year for the licensee who comes from elsewhere, opens his own office in the area and desires to apply for active membership.
Plaintiff contends that the great majority of all residential premises for sale within the Board's territory are offered through the Board's multiple listing service. He asserts that because a broker who is not a member of the Board is not permitted to participate in the benefits of the service he is precluded thereby from offering any of these premises for sale, and cannot compete successfully with Board member brokers. Plaintiff urges that the Board, in operating the multiple listing service to the exclusion of non-Board members, is engaged in an unlawful restraint upon the practice of the real estate profession and in an illegal restraint of trade.

I.
It is argued for the defense that the New Jersey Real Estate Commission, functioning under N.J.S.A. 45:15-1 et seq., has exclusive original jurisdiction over the subject matter involved in this litigation. Therefore, defendants urge, plaintiff must take his case to the Commission and exhaust his administrative remedies before asking a court to grant him relief.
*212 Defendants' position is unsound. Jurisdiction of an administrative agency is exclusive when the remedy which the agency is empowered to grant is the only available relief for the given situation. The New Jersey Real Estate Commission has power to hear complaints against its licensees for the purpose of deciding whether licenses should be suspended or revoked. N.J.S.A. 45:15-17 and 18. There is nothing to indicate that the Legislature intended to displace all common law actions in the courts when it gave to the agency these powers over licenses. Contrast may be made to the provisions making a claim for workmen's compensation enforceable only by an original proceeding in the Division of Compensation. N.J.S.A. 34:15-49. See Bendler v. Bendler, 3 N.J. 161, 171 (1949). Plaintiff in this case has two avenues available to him: one by complaint against licensees in the administrative forum under the statute, and the other in the court under the common law. The jurisdiction of the Real Estate Commission in this field is not exclusive. See 2 Am. Jur.2d, Administrative Law, § 784, p. 684.
N.J.S.A. 45:15-17 ends with the following language:
"The commission is expressly vested with the power and authority to make, prescribe and enforce any and all rules and regulations for the conduct of the real estate brokerage business consistent with the provisions of this act."
From this it may be argued that the primary jurisdiction doctrine should be applied in this case, i.e., that even though there is a judicial remedy in this field, the situation is such that judicial relief cannot be supplied without a prior determination by the New Jersey Real Estate Commission concerning the activity of defendants in this case. This argument must also be rejected. The above language cannot be construed as a grant of power to inquire into and make decisions concerning legal liability of licensees for practices in the real estate brokerage business. Even if this provision could be so construed, it nevertheless would be appropriate at this time to decide all of the questions now before the court. *213 Plaintiff's right to relief depends substantially upon answers to questions of law and the findings of fact which are pertinent to those questions are not ones requiring the specialized knowledge and experience of the Commission. See 2 Am. Jur.2d, Administrative Law, § 793, p. 696.

II.
Does the plaintiff, a private citizen who says his business has been damaged by a combination of competitors have a cause of action which he can assert against them? The monopolistic effects of restraint of trade have been regarded historically as matters of public concern rather than as mere private wrongs to be remedied by private suits. Chief Justice White said in Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910):
"Without going into detail, and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act, or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing, trade, but, on the contrary, were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy." (at p. 58, 31 S.Ct., at p. 515)
New Jersey has few authorities applicable to combinations in restraint of trade. The same comment can be made about state courts generally. Cases involving charges of malicious and deliberate actions by conspirators for the purpose of damaging a plaintiff's business are not in point. Examples from this class are Van Horn v. Van Horn, 52 N.J.L. 284 (Sup. *214 Ct. 1890), and Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1943). The plaintiff does not allege, and has not proved, that defendants in carrying on the restrictive practices which are challenged have been motivated by malice towards him.
A leading English case is Mogul S.S. Co. v. McGregor, 23 Q.B.D. 598 (Ct. App. 1889), affirmed in the House of Lords, [1892] A.C. 25. It was held there that a ship owner, damaged by being excluded from the tea shipping trade with China as a result of a combination of the defendants  also ship owners  had no cause of action, there being no proof that defendants had been motivated by anything but a desire to secure the trade for themselves and keep plaintiff and others out of it. In both the Court of Appeals and the House of Lords the point was made that illegality of combinations in restraint of trade would make them unenforcible between the parties, but would not give a damaged competitor a cause of action against the members of the combination.
The rule of the Mogul case was regarded by Vice-Chancellor Stevens as a bar to a suit brought by the Attorney General to enjoin rate fixing by a group of insurance companies. McCarter, Attorney General, v. Fireman's Ins. Co., 70 N.J. Eq. 291 (Ch. 1905). The Court of Errors and Appeals reversed, however (over a strong dissent by Justice Swayze). 74 N.J. Eq. 372 (1909). In the opinion for the majority it was said:
"The case of Mogul Steamship Co. v. McGregor [23 Q.B.D. 598], cited by the Vice-Chancellor, and relied upon by counsel for respondents, is not in point. There a court of law decided that a contract in restraint of trade, made by one set of shipowners, did not give another set of shipowners a legal cause of action against them for damages. The case has no bearing whatsoever upon the attitude of a court of equity when a suit is brought on behalf of the state in the interest of the public.
That the reasoning of Mogul Steamship Co. v. McGregor, even within the lines of its decision, is not likely to commend itself to jurisprudence generally is pointed out in an instructive article on `The Case of the Monopolies' by Sidney T. Miller, Esq., in the `Michigan Law Review' for November, 1907. Upon the point we are considering the case has no bearing whatsoever." (at p. 388, 73 A., at p. 86)
*215 And
"We cannot avoid, therefore, the following conclusions: First, that the increase of price wronght by this combination of insurers has not been justified; second, that such increase works actual injury to the public; third, that the contract by which such combination was effected is in restraint of trade and repugnant to public policy on that account, and fourth, that it is unreasonable in that it transcends the legitimate purposes for which the defendants were created or licensed and that such combination itself is characterized by all the evils that the common law by its rule against them placed under its condemnation. That the corporate acts by which such contract was entered into and such combination effected and its continuance perpetrated are ultra vires the defendants needs no further argument; that the defendants should be enjoined from such continuance follows from what has already been said." (at p. 392)
Turning to more recent cases, Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244 (App. Div. 1957), involved charges of parallel business action, detrimental to the plaintiffs, by three incorporated cemetery associations; but plaintiffs' allegations seem to have fallen short of charging a combination in restraint of trade. In any event, the case was decided in favor of plaintiffs on the ground that defendants were acting ultra vires and that plaintiffs had standing, because their business was affected, to seek equitable relief against the ultra vires practices. A situation similar to that of the Di Cristofaro case was presented in Terwilliger v. Graceland Memorial Park Ass'n, 59 N.J. Super. 205 (Ch. Div. 1960), affirmed 35 N.J. 259 (1961). There the Attorney General was joined as a party defendant, thus easing the problem of the right of a private citizen to sue to enjoin ultra vires acts harmful to his business. However, the Supreme Court said:
"In the actuality of business activity, plaintiff and defendants are competitors in the sale of grave markers. There can be no doubt that defendants' intimate relationship with lot owners and members of the bereaved families gives them a competitive advantage over plaintiff in a locality where they both vie for customers. In view of the general public interest in the operation of cemeteries, the law asks only a slight additional private interest as justification for seeking the remedial *216 services of the court. Whatever may be the requirement in ordinary cases, the combination of public policy considerations and status as a competitor in the locality must be treated as providing adequate standing in this type of controversy. Hudson Bergen County Retail Liquor Stores Ass'n v. Board of Comm'rs, City of Hoboken, 135 N.J.L. 502, 510 (E. & A. 1947); and see Walker v. Borough of Stanhope, 23 N.J. 657 (1957); Di Cristofaro v. Laurel Grove Memorial Park, supra, 43 N.J. Super., at pp. 253-254." (at p. 268)
Falcone v. Middlesex County Medical Society, 34 N.J. 582 (1961), is another case in which a private citizen was given relief against a situation harmful to his economic activities. While the relief sued for was a judgment requiring the Society to admit the plaintiff to membership, the basic question was the power of a private association to restrict an individual, licensed by the State, to practice his profession. To that extent the case is similar to the one presented by plaintiff here.
It can be argued strongly that the principles stated by the Supreme Court in Terwilliger are applicable here: that in addition to the public concern with monopolistic practices, there is a specific public interest in the real estate business  shown by the scheme of regulation provided by statute (N.J.S.A. 45:15-1 et seq.)  and that Mr. Grillo, because of his status as a licensed broker competing in the community where the alleged unlawful combination has a direct effect upon him, has more than a "slight additional private interest as justification for seeking the remedial services of the court." Yet such an argument must be considered critically. It could be advanced in support of a suit by a businessman to enjoin a competitor from falsely advertising the qualities of a product offered for sale by both. Up to now, however, suits in that form, though involving obvious elements of public concern and private interest, have not been sustained. American Washboard Co. v. Saginaw Mfg. Co., 103 F. 281 (6 Cir. 1900); Show Management v. Hearst Publishing Co., 196 Cal. App.2d 606, 16 Cal. Rptr. 731, 735-737 (D. Ct. App. 1961). Nevertheless, I conclude that the plaintiff Grillo is entitled to maintain his suit, there being an appropriate coupling *217 of public and private interests in the subject matter to justify that result.
Consideration of two precedents in addition to authorities already cited have helped to reach the conclusion just stated. Pratt v. British Medical Ass'n, [1919] 1 K.B. 244, furnishes good reason for thinking that the rule of the Mogul case would not now be applied by the courts of England to a situation like the one presented by the instant case. And there is direct authority for permitting a private litigant to sue for injunctive relief and damages against defendants who, though not motivated by malice toward plaintiff and not aiming specifically at his ruin, allegedly have engaged in a combination in restraint of trade harmful to plaintiff in his business or profession. Group Health Cooperative v. Kings County Medical Society, 39 Wash.2d 586, 237 P.2d 737 (Sup. Ct. 1951). There the court, after extensive review of authorities, said:
"We are of the view that, on both principle and authority, jurisdiction in equity should be exercised to grant affirmative relief where the contract or combination in restraint of competition results in irreparable injury to third persons. The same considerations lead us to conclude that monetary damages may also be recovered for such injury where the damage can be ascertained with reasonable certainty." (237 P.2d, at p. 775)

III.
Having decided that a private plaintiff may sue for relief against an illegal combination in restraint of trade, has such a combination been proved here?
The Board and its members are acting in combination. That combination is a restraint of trade. As Mr. Justice Brandeis observed in Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." But not every combination in restraint of *218 trade is illegal. In Trenton Potteries Co. v. Oliphant, 58 N.J. Eq. 507, 514 (E. & A. 1899), Chief Justice Magie said:
"* * * while the public interest may be that trade in general shall not be restrained, yet it also permits and favors a restraint of trade in certain cases."
It is the unreasonable combination in restraint of trade that is unlawful. Judge Learned Hand stated in United States v. Associated Press, 52 F. Supp. 362, 368 (S.D.N.Y. 1943), affirmed 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944):
"* * * as everyone now agrees, since the decisions of the Supreme Court in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann. Cas. 1912D, 734, and American Tobacco Co. v. United States, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, restriction alone is not enough to stamp a combination as illegal; it must be `unreasonable' in the sense that the common law understood that word; * * *."
It is the policy of the common law to encourage competition. United States v. Addyston Pipe & Steel Co., 85 F. 271, 283 (6 Cir. 1898), affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Action of a combination is "unreasonable" if its operation has or may have a tendency toward preventing competition, raising prices, or creating a monopoly and cannot be justified under the circumstances. See 36 Am. Jur., Monopolies, Combinations, and Restraints of Trade, § 5, p. 482. The same rule is indicated in McCarter, Attorney General, v. Firemen's Ins. Co., supra.
There is good in the multiple listing system. It provides an effective method for selling and buying properties. The seller benefits because his property is exposed in a number of offices, hence reaches a wider market in a shorter period of time. It is also useful and convenient to the prospective buyer who is seeking a house that will suit his needs and purse. From one selling agent he can learn of many of the properties for sale in the area. In effect, the multiple listing service operates as an exchange for the sale of real estate. The multiple listing system can potentially stimulate competition *219 in the real estate field by placing listings in the hands of all brokers in the area. Yet under the rules and regulations governing multiple listing each member of the Board has agreed that he will not supply information about properties for which he has obtained sale listings to nonmember brokers, but only to other members of the Board through the multiple listing service. The commitment to furnish information about properties for sale only to fellow members may be characterized as a concerted refusal to deal with nonmembers, or as a group boycott.
The dearth of precedent in New Jersey on combinations in restraint of trade has already been noted. Much litigation in this field has proceeded in the federal courts under federal anti-trust legislation. The Sherman Anti-Trust Act, 15 U.S.C.A. § 1, et seq., has been held to incorporate the common law principles of restraint of trade into federal statutory law. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910). While not binding upon our state courts, the federal anti-trust experience under the Sherman Act is applicable to questions of what is reasonable and unreasonable and serves as a useful guide for our common law restraint of trade problems.
Assaying their experience, the federal courts have determined that certain activities in combination, "because of their pernicious effect on competition and lack of any redeeming virtue," are conclusively presumed to be unreasonable and unlawful under the Sherman Act without inquiry into the harm caused by these practices or the business excuse for their use. Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The group boycott, or concerted refusal to deal, has been held to be within this forbidden category. Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). However, as the present case is a novel one in a court of first impression, I feel that I must determine the legality of defendants' combination  whether it is reasonable or unreasonable  for myself.
*220 The United States Supreme Court has considered the effect on competition of the group boycott, or concerted refusal to deal. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944), involved a cooperative association composed of the publishers of more than 1,200 newspapers in the United States. Employees of the member newspapers of the association obtained news and transmitted it to the association, which in turn channeled it to the other members. The association's by-laws were so framed that members could block nonmember competitors from membership and prohibited members from furnishing news obtained by them to any nonmember in advance of publication. It was held that the purpose and effect of these by-laws was to hinder and impede the growth of competing newspapers, and hence they were contracts in restraint of trade. The court said:
"Inability to buy news from the largest news agency, or any one of its multitude of members, can have most serious effects on the publication of competitive newspapers, both those presently published and those which, but for these restrictions, might be published in the future." (at p. 13, 65 S.Ct., at p. 1421)
In Klor's Inc. v. Broadway-Hale Stores, supra, petitioner, a retail appliance dealer, alleged a conspiracy between a neighboring retail competitor and certain manufacturers and distributors of appliances not to sell to Klor's or to sell to it only at discriminatory prices. Holding that the lower courts had erred in dismissing the complaint, the Supreme Court said:
"Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its `nature' and `character,' a `monopolistic tendency.' As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction *221 makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups." (359 U.S., at p. 213, 79 S.Ct., at p. 710)
More recently, Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), was decided. Plaintiffs were traders in over-the-counter securities. Not being members of the Exchange, they arranged for private wires to trading departments of ten member firms of the Exchange. The Exchange disapproved these connections and required member firms to discontinue the wires. Concerning the effect of the loss of the wire service upon the plaintiffs and other dealers in securities, the court said:
"Unlike listed securities, there is no central trading place for securities traded over the counter. The market is established by traders in the numerous firms all over the country through a process of constant communication to one another of the latest offers to buy and sell. The private wire connection, which allows communication to occur with a flip of a switch, is an essential part of this process. Without the instantaneously available market information provided by private wire connections, an over-the-counter dealer is hampered substantially in his crucial endeavor  to buy, whether it be for customers or on his own account, at the lowest quoted price and sell at the highest quoted price. Without membership in the network of simultaneous communication, the over-the-counter dealer loses a significant volume of trading with other members of the network which would come to him as a result of his easy accessibility. These important business advantages were taken away from petitioners by the group action of the Exchange and its members." (at p. 348, 83 S.Ct., at p. 1252)
Concerted refusals by professional or trade associations to deal have been held to be illegal in the following cases: Pratt v. British Medical Ass'n, supra; American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943); Tatkin v. Superior Court, 106 Cal. App.2d 745, 326 P.2d 201 (Cal. App. 1958); Hubbard v. Medical Service Corp. of Spokane County, 59 Wash.2d 449, 367 P.2d 1003 (Sup. Ct. 1962); People v. Santa Clara Valley Bowling Proprietors' Ass'n, 47 Cal. Rptr. 570 (D. Ct. App. 1965). Cf. Group Health Cooperative v. King County Medical Society, supra, 237 P.2d, at pp. 759-760.
*222 Plaintiff and others who are nonmembers of defendant Board are placed at a competitive disadvantage as a result of the defendants' action in combination. Nonmember brokers, unable to provide the advantages of the multiple listing system, may lose the listings of sellers who are interested in displaying their property to the widest possible audience. The prospective buyer who is interested in a broad selection will most likely go to a Board member who can offer him all the properties listed with other Board members in the area. The nonmember broker will not be able to serve effectively the prospective buyers who do come to him. He is precluded from offering for sale a high percentage of the properties which are for sale in the Board's area. Many of the properties for sale will be unknown to the nonmember broker  although the Board member has easy access to this same information. If the nonmember broker does learn of a property which has been multiple listed, and finds a buyer for it, he will not be able to make the sale. The selling owner, already committed to pay a commission to a Board member, cannot afford to sell through the nonmember broker and pay another commission to him.
"His knowledge of available properties is the broker's chief stock in trade." Myers v. Arcadio, Inc., 73 N.J. Super. 493, 499 (App. Div. 1962). Listings are equivalent to the news items of the Associated Press case, to the appliances of the Klor's case, and to the information available by direct wire service in the Stock Exchange case. Without goods to sell the businessman cannot survive. The restrictions which defendants have placed in the way of a nonmember obtaining and using listings may drive that nonmember from the field of real estate selling. Since the newcomer cannot even apply for membership in the Board without a waiting period  and then may fail of admission  defendants' combination may discourage the opening of new offices. It has been recognized that effective or workable competition requires "the presence in the market of several sellers, each of them possessing the capacity to survive and grow, and the preservation of conditions *223 which keep alive the threat of potential competition from others." Wilcox, Competition and Monopoly in American Industry, p. 8 (T.N.E.C. Monograph No. 21, 1941).
A multiple listing system can broaden the market for real estate transactions and improve competition. However, I find that defendant Board's method of conducting its multiple listing service tends to stifle rather than promote competition. I find also that plaintiff has suffered diminution of profits in his business as a result of the restraints thus imposed upon full and free competition by defendants.
A combination in restraint of trade may be justified, however, under some circumstances, and if so justified is not illegal. Board of Trade of City of Chicago v. United States, supra. Can defendants justify their combination? They argue they may properly strive to establish and improve standards for their occupation. By restricting the multiple listing service to members of the Board and subjecting members to a Realtor Code of Ethics, the Board assures buyers and sellers entrusting their properties to its care that their affairs will be handled by competent, qualified and honest men. It is also urged that a member broker should not be compelled to cooperate on a sale with a broker who is not subject to the Board's disciplines and who may not be regarded as fully trustworthy.
A court should look with sympathy on attempts by business and professional associations to elevate standards. Falcone v. Middlesex Co. Medical Soc., 34 N.J. 582, 598 (1961); Greisman v. Newcomb Hospital, 40 N.J. 389, 403 (1963). But as observed by the Court of Appeals in United States v. American Medical Ass'n, 72 App. D.C. 12, 110 F.2d 703 (D.C. Cir. 1940):
"Organizations and rules which have as their purpose the improvement of conditions in any particular trade or occupation, and the regulation of relations between traders, are, as we have just pointed out, beneficial rather than detrimental to the public interest. But when these same organizations go so far as to impose unreasonable restraints on the operations in their field, they become subject to the *224 prohibition of the Sherman Act. Sugar Institute v. United States, 297 U.S. 553, 597-600, 56 S.Ct. 629, 80 L.Ed. 859." (at p. 712)
The situation before me is similar in significant respects to a combination struck down by the United States Supreme Court in Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). In that case members of the Guild refused to deal with retailers who offered for sale garments and fabrics that were copied from originals of Guild members. The Guild contended that this action should be permitted since it was aimed at stamping out a trade evil called "style piracy." The Supreme Court held that the Guild's motive would not save their combination from the Sherman Act, saying:
"* * * the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus `trenches upon the power of the national legislature and violates the statute.' Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 242, 20 S.Ct. 96, 44 L.Ed. 136, 148." (at pp. 465-466, 61 S.Ct., at p. 707)
Also see American Med. Ass'n v. United States, 76 U.S. App. D.C. 70, 130 F.2d 233, 249 (D.C. Cir. 1942). Cf. United States v. National Ass'n Real Estate Boards, 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). But cf. Purofied Down Prod. Corp. v. National Ass'n of Bed Mfrs., 201 Misc. 149, 105 N.Y.S.2d 132 (Sup. Ct. 1951).
Defendants contend they have refused to distribute listing information to Grillo and other nonmembers because nonmembers may not be competent or may engage in practices which by Board standards would be unethical. There is no need to consider whether these contentions would have any weight if the real estate business were entirely free of public regulation. See Fashion Originators' Guild v. F.T.C., supra. Here there is a comprehensive scheme of public regulation. N.J.S.A. 45:15-1 et seq. Every broker and salesman must be licensed (sec. 1). The licensing body, the New Jersey Real *225 Estate Commission, is composed of five members appointed by the Governor, each having at least ten years of experience as a broker prior to appointment (sec. 5). No one can apply for a broker's license until he has first served an apprenticeship for two years as a licensed salesman employed by a licensed broker. Applicants for all licenses must furnish evidence of good moral character (sec. 9). Each must pass an examination in order to demonstrate his general education and knowledge of real estate matters (sec. 10). All licenses must be renewed annually (sec. 10), and every licensee is subject to the power of the Commission to suspend or revoke licenses for cause. Section 17 of the act contains a long series of subsections spelling out offenses for which a licensee, if found guilty, may be penalized. In addition to the more particular subsections, there is one empowering the Commission to suspend or revoke a license when the licensee has been found guilty of any conduct which demonstrates "unworthiness, incompetency, bad faith or dishonesty."
It has been held that the State has preempted the regulation of brokers and salesmen engaged in the real estate business. Mogelefsky v. Schoem, 90 N.J. Super. 49, 59 (App. Div. 1966); State v. Stockl, 85 N.J. Super. 591, 599 (Law Div. 1964). Insofar as the Board seeks through its combination to protect the public in real estate dealings, it is proceeding as an extra-governmental body in a preempted field. The grounds stated by the Board do not justify the combination.
I conclude that the Board and its members are engaged in an unreasonable and hence illegal restraint upon trade in violation of the common law.

IV.
The common law on restraints of trade emphasizes the element of public harm produced by the alleged combination. Considering plaintiff's case as one for relief against an illegal combination in restraint of trade is not the only available approach. The concerted refusal of a group of traders to *226 deal with another businessman may also be a private wrong, requiring no showing of harm to the public as a basis for relief.
A line of cases in this State has established the right of a businessman to be protected from unjustified interference with a particular transaction in which he is involved and from which he has reasonable expectations of economic advantage. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1934); Newark Hardware & Supply Co. v. Stove Mfrs. Corp., 136 N.J.L. 401 (Sup. Ct. 1947), affirmed 137 N.J.L. 612 (E. & A. 1948); Louis Schlesinger Co. v. Rice, 4 N.J. 169 (1950); Mayflower Industries v. Thor Corp., 15 N.J. Super. 337 (Ch. Div. 1951), affirmed o.b. 9 N.J. 605 (1952); McCue v. Deppert, 21 N.J. Super. 591 (App. Div. 1952); Geo. H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159 (App. Div. 1957); Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957); Myers v. Arcadio, Inc., 73 N.J. Super. 493 (App. Div. 1962); Fitt v. Schneidewind Realty Corp., 81 N.J. Super. 497 (Law Div. 1963); Harris v. Perl, 41 N.J. 455 (1964). A defendant may be liable, even though he is a competitor motivated by the desire for profit. The test for liability was set out in Sustick v. Slatina, supra:
"In this area of the law the use of such expressions as conspire, unlawful, malicious, etc., has been criticized as beclouding judgment and clear thinking in the formulation of rules of liability. See Weinstein v. Clementsen, 20 N.J. Super. 367, 371 (App. Div. 1952). Yet a degree of generality in the criteria which will suffice to spell out liability in any given case of this kind is unavoidable. The essence of the cases in this field is that in adjudging whether what the defendant has done is actionable, i.e., not done in the exercise of an equal or superior right, the ultimate inquiry is whether the conduct was `both injurious and transgressive of generally accepted standards of common morality or of law.' Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 255 (App. Div. 1957). In other words, was the interference by defendant `sanctioned by the "rules of the game."' 1 Harper and James, op. cit. supra, § 6.11, p. 510; cf. Trautwein v. Harbourt, 40 N.J. Super. 247, 267, 268 (App. Div. 1956). There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not *227 only must defendants' motive and purpose be proper but so also must be the means. Louis Kamm, Inc. v. Flink, supra (113 N.J.L., at p. 589)." (48 N.J. Super., at p. 144)
Our situation differs from the cases just cited. Here there is interference with potential dealings of plaintiff  dealings in which he was never involved but with which he might have been connected were it not for his being denied listing information by defendants' combination. These probable expectancies deserve protection from unjustified interference, just as much as relations that have already become somewhat fixed. Disturbance of probable expectancies, just as interference with more finite relations, may take from the entrepreneur the fruits and advantages of his own industry, skill and credit, which it is the policy of this State to safeguard. The general test enunciated in Sustick is applicable here as well. Of course, the "rules of the game" must be considered in the light of these different circumstances.
A concerted refusal to deal which unjustifiably interferes with plaintiff's probable expectancies, in my opinion, falls outside the "rules of the game." The following proposition appears in 4 Restatement of Torts, § 765, p. 42 (1939):
"(1) Persons who cause harm to another by a concerted refusal in their business to enter into or to continue business relations with him are liable to him for that harm, even though they would not be liable for similar conduct without concert, if their concerted refusal is not justified under the circumstances."
See "Developments in the Law - Competitive Torts," 77 Harv. L. Rev. 888, 929-932 (1964). As the Restatement suggests, it is the collective nature of this activity that is objectionable. Concerted activity by business units otherwise independent of each other is a suspect form of conduct. An individual should assume that he will meet the competition of other individual business units. He should not be subject to harmful action of separate entities in combination without good cause. Although Associated Press v. United States, supra, involved a refusal to deal under the Sherman Act, the remarks of Mr. Justice *228 Black are relevant here. Speaking of a combination which he found "bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete," he said:
"Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with * * * practical, everyday knowledge be attributed to individual `enterprise and sagacity;' such hampering of business rivals can only be attributed to that which really makes it possible  the collective power of an unlawful combination." (326 U.S., at p. 15, 65 S.Ct., at p. 1422, 89 L.Ed., at p. 2013)
Situations which can be classified as concerted refusals to deal causing harm to possible future relations were redressed on other theories in Di Cristofaro v. Laurel Grove Memorial Park, Terwilliger v. Graceland Memorial Park Ass'n, and Falcone v. Middlesex County Medical Soc., all supra.
The combined activity of defendants in this case has already been described and harm to plaintiff found. The justification offered by defendants in response to the charge of an illegal restraint of trade also fails here for the reasons stated in section III of this opinion. As an alternative holding, I conclude that defendants are liable to plaintiff for the private harm done him by their concerted refusal to allow him to participate in the benefits of the multiple listing system.

V.
I come now to the question of what relief would be appropriate in this case.

INJUNCTIVE RELIEF
Plaintiff is entitled to an injunction which will protect him  and all other licensed brokers similarly situated  against the burden of competing with members of a multiple listing system from which he is excluded.
However, it would be unfortunate for the public as well as for licensed real estate brokers and salesmen if the multiple listing system should be eliminated entirely by order of the *229 court. Accordingly, I will enjoin the operation of the multiple listing service of defendant Board in its present form, but leave it open to the Board to modify its rules and regulations to enable nonmember brokers with offices in the Board's territory to participate in the multiple listing system. Authority for such a judgment can be found in United States v. Associated Press, supra, 52 F. Supp., at p. 375, and 326 U.S., at p. 21, 65 S.Ct. 1416. The following changes, it appears to me, are required: (1) Listing information collected by the multiple listing service shall be made available to licensed nonmember brokers having places of business in the Board's area on the same basis as it is made available to Board members. (2) In order to secure the benefits of the multiple listing system, all brokers, both members and nonmembers of the Board, must comply with Board regulations which require all property listings obtained by them, with certain specified exceptions, to be forwarded to the service for distribution to other participating brokers. (3) The multiple listing service shall receive and distribute listings secured by nonmember brokers in the area of the Board on the same basis as listings obtained by Board members. (4) The service shall be entitled to receive a percentage of the brokerage commission when the sale of a listed property is consummated by a member or nonmember broker. These four points are not intended to rule out the possibility that other changes in the rules and regulations of the Board will be found necessary or desirable when those rules and regulations are reviewed for the purpose of placing Board members and nonmember brokers on an equal footing in the multiple listing system.
The judgment to be submitted may provide a reasonable time for accomplishing such changes as are to be made, and for retention of jurisdiction to pass upon, if need be, whether such changes comply with the views expressed in this opinion.
Although there may be problems in the future concerning participation in the Board's multiple listing system by brokers who have their offices outside of the Board's area, it *230 should be said clearly that I have not considered any such question.

COMPENSATORY DAMAGES
Defendants contend that damages in this case cannot be ascertained without resort to mere speculation and conjecture and, therefore, should not be allowed. I have found as a fact that harm did ensue to plaintiff as a result of the combined activity of defendants. The difficulty of ascertaining with precision how much better plaintiff would have done if he had been a member of the multiple listing service must be conceded. Yet uncertainty as to the measure or extent of damages should not bar recovery. In 25 C.J.S. Damages § 28, pp. 684-688, it is stated:
"The rule as to the recovery of uncertain damages generally has been directed against uncertainty as to fact or cause of damage rather than uncertainty as to measure or extent. In other words, the rule against uncertain or contingent damages applies only to such damages as are not the certain results of the wrong, and not to such as are the certain results but uncertain in amount.
In many cases, although substantial damages are established, their amount is, in so far as susceptible of pecuniary admeasurement, either entirely uncertain or extremely difficult of ascertainment; in such cases plaintiff is not denied all right of recovery, and the amount is fixed by the court * * * in the exercise of a sound discretion * * *."
Our Supreme Court, in Tessmar v. Grosner, 23 N.J. 193 (1957), substantially agreed, saying:
"If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient. Wolcott, Johnson & Co. v. Mount, 36 N.J.L. 262, 272 (Sup. Ct. 1873), affirmed 38 N.J.L. 496 (E. & A. 1875). The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damages and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." (at p. 203)
The damages in the instant cause may be ascertained with some reasonable degree of certainty. Plaintiff opened his brokerage office in Plainfield in the middle of 1958 *231 and may fairly be said to have been injured in his business from the beginning of 1959 through mid-1965, the time of the trial of this case. Defendant Board's annual reports show the volume of multiple listed property sold during those years:

 Year Volume
 1959 .............. $ 8,398,459
 1960 .............. 7,915,880
 1961 .............. 9,448,169
 1962 .............. 10,639,384
 1963 .............. 12,812,724
 1964 .............. 13,026,680
 1965 .............. 5,186,775 (Figure not available. Average for
 six-month period 1959-64 used.)
 ___________
 TOTAL ............. $67,428,071

The total broker's commission is usually 6% of the selling price, with 75% of that commission going to the selling broker (when not also the listing broker) according to the Board's rules and regulations. Therefore, selling brokers of the Board may be treated as having earned $3,034,263 (4.5% of $67,428,071) over this 6 1/2-year period. Although the record indicates that there is a great disparity between the different members of the Board in the number of sales made of multiple listed properties, I think it just to assume that plaintiff, if he had participated in the system, would have achieved sales equal to the average of the members of the Board, and would thus have earned additional gross commissions of $54,545 ($3,000,000 divided by 55 members). The proofs show that Grillo had a modest success in the real estate business in the years prior to trial. Gross commissions are subject to salemen's compensation (50% of the gross commission) and to other operating expenses. The Board member who handled the greatest dollar volume through the multiple listing system in 1964 realized a net profit of $24,811 on a gross commission total of $171,500, indicating that after salesmen's commissions, advertising and other expenses are paid, approximately one-seventh of gross commissions remains *232 as compensation or profit for the broker-owner. Grillo gave his own estimate of the cost of doing business as 70% or 80%. This evidence furnishes a basis for taking one-sixth of the estimated total of additional income as net profit. Accordingly, I will award damages to plaintiff in the amount of $9,000. As the injury here has resulted from the concerted activity of all defendants, they are jointly and severally liable for the damages. Any individual defendant who was not a member of the Board during the entire period from 1959 to mid-1965 shall be liable for a proportionate amount of the damages awarded. Counsel should ascertain if any defendants are thus entitled to a reduction in liability and so provide in the judgment to be submitted.

PUNITIVE DAMAGES
Plaintiff's demand for punitive damages must be denied. As stated by Dean Prosser, quoted in Berg v. Reaction Motors Div., 37 N.J. 396, 413 (1962):
"`Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called willful or wanton.'"
The grounds for imposition of punitive damages were summarized in La Bruno v. Lawrence, 64 N.J. Super. 570 (App. Div. 1960), certification denied 34 N.J. 323 (1961):
"* * * (1) actual malice, which is nothing more or less than intentional wrongdoing  an evil-minded act; or (2) an act accompanied by a wanton and willful disregard of the rights of another." (at p. 575)
As already stated, I find no malice in the combined action of defendants, nor was it shown that their activity was carried out in wanton and willful disregard of the rights of plaintiff. Their combination, represented by the multiple listing service, was motivated, at most, by an intent and desire to promote their business.