384 So.2d 303 (1980)
INSURANCE FIELD SERVICES, INC., John D'Angelo and Joan D'Angelo, Appellants/Cross-Appellees,
v.
WHITE & WHITE INSPECTION AND AUDIT SERVICE, INC., a Missouri Corporation, Appellee/Cross-Appellant.
No. 78-1180/NT4-85.
District Court of Appeal of Florida, Fifth District.
June 11, 1980.
*304 Nicholas Yonclas and Michael P. McMahon of Akerman, Senterfitt & Eidson, Orlando, for appellants/cross-appellees.
Thomas B. Tart of Gurney, Gurney & Handley, P.A., Orlando, and William C. Partin, Kansas City, Mo., for appellee/cross-appellant.
GLICKSTEIN, HUGH S., Associate Judge.
Appellants, Insurance Field Services, Inc., John D'Angelo and Joan D'Angelo, bring this appeal from a final judgment and order modifying final judgment which enjoined John D'Angelo from competing against appellee until August 1, 1979, and which ordered John D'Angelo to pay $8,500.00 in *305 compensatory damages to appellee and the remaining appellants to pay nominal damages in the amount of $1.00.
Appellee, White & White Inspection and Audit Service, Inc., cross-appeals and urges as error the absence of punitive damages being assessed against the appellants, the trial court's failure to enjoin Joan D'Angelo and Insurance Field Services, and the appropriateness of the nominal damages of $1.00 assessed against them.
We affirm in part, reverse in part and remand.
Appellee, a Missouri corporation, is engaged in providing underwriting inspections, premium audits, and loss control work for the insurance industry. As of July, 1977, John D'Angelo had been appellee's branch manager in Florida for over four years D'Angelo's wife, Joan, was employed by appellee in the Florida office where she performed all of the required clerical duties.
In July of 1977, Insurance Field Services, Inc., was incorporated by John D'Angelo and two other individuals, one of whom was a field representative for the appellee, to compete in the same work as appellee. John D'Angelo was the president of the newly created corporation and the owner of 51% of the capital stock. Joan D'Angelo, while not a stockholder, was the secretary-treasurer.
At the time of the formation of the appellant corporation, John D'Angelo was party to an agreement with appellee, paragraph X of which required him not to compete with appellee for two years after termination of the agreement.[1] Notwithstanding the existence of the agreement and the covenant not to compete, John D'Angelo in July, 1977, together with his wife Joan, undertook to solicit appellee's customers for the newly formed corporation, as well as to acquire the services of appellee's field representatives for the benefit of said corporation.
In one instance, the evidence was uncontradicted that efforts by John D'Angelo to solicit an insurance company which had been a high volume account of the appellees resulted, following unsuccessful efforts by appellee to save the account, in the insurance company obtaining services elsewhere.
Meanwhile, in furtherance of her efforts to advance the business of the new corporation, Joan D'Angelo had advised an agent of one of appellee's customers that appellee was going out of business in Florida, had told the postman to transfer appellee's mail to the new address of the corporate appellant and that appellee "would be no more," and had issued a written directive to all of the successfully solicited field men to commence work immediately for the corporate appellant on those accounts of appellee's customers who had authorized the change  all without appellee's knowledge and consent.
By August 1, 1977, John D'Angelo, together with the assistance of his wife Joan, had effectively solicited the services of all of appellee's field representatives, except one, and had assurances of business from many of appellee's customers, all of which customers had been transacting their business with appellee through the D'Angelos or the field representatives.
On August 1, 1977, John D'Angelo sent appellee a letter of resignation and, together with his wife, moved out of appellee's office. By that time, the D'Angelos had *306 assigned to their solicited field representatives, for the benefit of the corporate appellant, and without the knowledge and consent of appellee, between 300 to 400 work items which insurance company clients had previously submitted to appellee.
Appellee's president, Alva J. White, upon learning of the resignation, immediately came to Florida in an effort to reorganize the office and protect appellee's business. A telegram was sent by White to John D'Angelo on August 5, 1977, demanding the return of any work in progress and the return of the files of the appellee which had been taken in the move. A few days later, White and the D'Angelos discussed the return of the work in progress, to which return said appellants acceded.
At the time of final hearing, the corporate appellant's work items had risen to 1,191, while appellee's had dropped to 533. White testified that appellee's Florida branch had turned the corner, profit-wise, in late 1976; that for the period of July 1, 1977, through February 28, 1978, appellee's profits were approximately $17,000.00 less than the same period of the preceding fiscal year; that from and after August 1, 1977, appellee had either totally or partially lost business from sixteen different insurance companies, some of which companies had been using appellee's services for both audits and inspections; that as of August 1, 1977, appellee lost seven field representatives and a field manager; and that to reorganize the Florida office, 24 man weeks of additional help and 14 weeks of the president's time had been expended.
We initially note that since August 1, 1979, has passed that portion of the final judgment which enjoined John D'Angelo and failed to enjoin other appellants from competing with appellee until that date has become moot. Accordingly, as to that portion of the final judgment we affirm.
We are thus left with reviewing the respective compensatory awards fashioned in favor of appellee against John D'Angelo, Joan D'Angelo, and Insurance Field Services, Inc., based on the trial court's controverted finding that the parties had tortiously interfered with appellee's business relationships.
In Lake Gateway Motor Inn, Inc., v. Matt's Sunshine Gift Shops, Inc., 361 So.2d 769 (Fla.4th DCA 1978), we held that to be actionable, tortious interference requires:
(1) the existence of an advantageous business relationship under which the plaintiff has legal rights;
(2) an intentional and unjustified interference with that relationship by the defendant, and
(3) damage to the plaintiff as a result of the breach of the business relationship.
See also, Serafino v. Palm Terrace Apartments, Inc., 343 So.2d 851 (Fla.2d DCA 1976); Smith v. Ocean State Bank, 335 So.2d 641 (Fla.1st DCA 1976); Symon v. J. Rolfe Davis, Inc., 245 So.2d 278 (Fla.4th DCA 1971); 45 Am.Jur.2d, Interference § 50.
We are of the opinion that as to all three appellants, all of the requisite elements exist in this case.
First, economically advantageous business relationships, capable of ascertainment, existed between appellee and its numerous insurance company clients, pursuant to which appellee had legal rights. These legal rights need not have been evidenced by an enforceable contract. Azar v. Lehigh Corp., 364 So.2d 860 (Fla.2d DCA 1978); John B. Reid and Associates, Inc. v. Jimenez, 181 So.2d 575 (Fla.3d DCA 1965); Franklin v. Brown, 159 So.2d 893 (Fla.1st DCA 1964).
Secondly, for the reasons herein set forth, we find an intentional and unjustified interference with those relationships by all appellants.
The question of whether appellants' admittedly intentional interference was unjustifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the *307 relation of the parties are important. Restatement 2d, Torts § 767 and comments.
In framing the issue, we agree with the opinion of the New Jersey Supreme Court in Grillo v. Board of Realtors of the Plainfield Area, 91 N.J. Super. 202, 219 A.2d 635 (1966), that the ultimate inquiry is whether the interference by the defendant is "sanctioned by the rules of the game." As the New Jersey Court notes:
There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must defendants' motive and purpose be proper but so also must be the means. (Citations omitted). 219 A.2d at 649.
Here, all appellants claim the privilege of competition in justifying their interference with appellee's business relations. We first dispose of that contention with regard to John D'Angelo by noting that his agreement with appellee included a covenant not to compete.
Section 542.12(2), Florida Statutes (1977), provides that:
One who sells the good will of a business, or any shareholder of a corporation selling or otherwise disposing of all his shares in said corporation, may agree with the buyer, and one who is employed as an agent or employee may agree with his employer, to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, so long as the buyer or any person deriving title to the good will from him, and so long as such employer continues to carry on a like business therein. Said agreements may, in the discretion of a court of competent jurisdiction be enforced by injunction. (Emphasis added).
Although it found Mr. D'Angelo to be an independent contractor rather than an employee, we find the trial court misconceived the legal effect of the sufficiency of the evidence, and that Mr. D'Angelo is, in our opinion, an agent within the meaning of Section 542.12(2) as interpreted by this court in Economic Research Analysts, Inc. v. Brennan, 232 So.2d 219 (Fla.4th DCA 1970).[2] Accordingly, the covenant not to compete executed by Mr. D'Angelo was enforceable and precluded him, and Insurance Field Services, Inc., of which he was president, from competing with appellee.
In any event, even if there had been no restrictive covenant, we believe there exists a more compelling reason for finding that the conduct of the appellants amounted to an unjustified interference. The evidence is undisputed that virtually all of the soliciting of appellee's customers and field agents and related activity engaged in by the D'Angelos for the benefit of the corporate appellant occurred during the period the D'Angelos were employed by the appellee.
While in the absence of an agreement, there is normally nothing improper with an agent or employee terminating *308 the employment relationship and proceeding to compete with his former principal or employer, there nevertheless exists during the ongoing relationship a common law duty not to engage in disloyal acts in anticipation of future competition. Restatement (Second) of Agency § 393, Comment e, (1958); see, e.g., Las Luminarias of the New Mexico Council of the Blind v. Isengard, 92 N.M. 297, 587 P.2d 444 (1978); Town and Country House and Homes Service, Inc. v. Evans, 150 Conn. 314, 189 A.2d 390 (1963); Becker v. Bailey, 268 Md. 93, 299 A.2d 835 (1973); Berry v. Goodyear Tire and Rubber Company, 270 S.C. 489, 242 S.E.2d 551 (1978); Lowndes Products, Inc. v. Brower, 259 S.C. 322, 191 S.E.2d 761 (1972); Gaal v. BASF Wyandotte Corporation, 533 S.W.2d 152 (Tex. Civ. App. 1976). See generally, 2 Fla.Jur.2d, Agency and Employment §§ 70, 140. Appellants John and Joan D'Angelo breached their duty of loyalty to the appellee by securing the services of appellee's field agents and the business of appellee's customers prior to August 1, 1977, while still in the employ of appellee. Since the means by which the D'Angelos sought to compete with appellee were improper, their intentional interference with appellee's business relationships was unjustified. The corporate appellant can assert no claim which would entitle it to the benefits which flowed from the D'Angelos' breach of duty.
Finally, we conclude that entry of judgment in the amount of $8,500.00 in favor of appellee, that figure representing half of its lost profits as attributable to the tortious conduct of John D'Angelo, was supported by competent substantial evidence. Appellant, John D'Angelo contends that the amount, as bearing upon appellee's loss of prospective profits, was not established with reasonable certainty. Conner v. Atlas Aircraft Corporation, 310 So.2d 352 (Fla.3d DCA 1975). However, as this court noted in Adams v. Dreyfus Interstate Development Corporation, 352 So.2d 76 (Fla.4th DCA 1977):
Uncertainty as to the amount of damages or difficulty in proving the exact amount will not prevent recovery where it is clear that substantial damages were suffered and there is a reasonable basis in the evidence for the amount awarded. Ultimately the degree of certainty simply requires that the mind of a prudent impartial person be satisfied with the damages. Id. at 78.
Here, there is no question but that the tortious interference of appellants was the direct cause of appellee's lost profits from August, 1977, through February, 1978.
Appellee's business, like most companies, revolves, in large measure, upon the building of good will accomplished when a client becomes accustomed to dealing with someone who is regularly performing a service. Appellee's field representatives and the individual appellants had been performing services for appellee's customers in a satisfactory manner, and the record provides no indication that its customers had any inclination to terminate using appellee's services. The price increase instituted by appellee only became significant when appellants began quoting cheaper prices to be charged by the new corporation.
We are not required, in determining whether appellee's damages were established with the requisite certainty, to speculate about the future. On the contrary, the evidence establishes a well organized corporation, with every reason to expect higher profits from and after August 1, 1977, thrown into an organizational tailspin because of its loss of goodwill occasioned solely by appellants' conduct.
We hold that appellee was entitled to compensatory damages of $8,500.00 not only from John D'Angelo but from all the appellants, jointly and severally, whose tortious conduct, while acting in concert, caused appellee's damages. Bermil Corporation v. Sawyer, 353 So.2d 579 (Fla.3d DCA 1977); Mead Corporation v. Mason, 191 So.2d 592 (Fla.3d DCA 1966).
Appellee also sought punitive damages but that claim, we conclude, was properly stricken by the trial court. See Hoppe v. Hoppe, 370 So.2d 374 (Fla.4th DCA 1978).
*309 Accordingly, we affirm the final judgment for injunction and compensatory damages against John D'Angelo, reverse the post judgment order, and remand for entry of judgment in the sum of $8,500.00 against Joan D'Angelo and Insurance Field Services, Inc., jointly and severally.
AFFIRMED in part, REVERSED in part, and REMANDED.
CROSS, J., concurs.
BERANEK, JOHN R., Associate Judge, dissents with opinion.
BERANEK, JOHN R., Associate Judge, dissenting:
I respectfully dissent. The trial court found that the agreement not to compete between John D'Angelo, appellant, and White & White Inspection and Audit Service, Inc., appellee/cross-appellant, was enforceable under Section 542.12(2), Florida Statutes (1977). The trial court found John D'Angelo to be an independent contractor, and thus should have held the non-competitive clause not enforceable under Florida law. The issue before the trial court was whether the law of Missouri would allow enforcement of such a non-competitive agreement and whether such an agreement was contrary to the public policy of the State of Florida to the extent that a Florida court should not aid in the enforcement of it. The trial court found in favor of enforcing the non-competitive agreement, and I believe this ruling was inconsistent with the finding that John D'Angelo was, in fact, an independent contractor. I do not concur with the majority that Mr. D'Angelo was "an agent" as a matter of law.
I would hold that the non-competitive agreement was erroneously enforced and reverse the case for further consideration of the demand for damages based upon the theory that Mr. and Mrs. D'Angelo are liable for damages by virtue of having intentionally pirated the business of White & White Inspection and Audit Service, Inc., while they remained associated with that business.
NOTES
[1] Covenant Not to Compete:

10.1 Contractor agrees that for a period of two years following the termination of this agreement, whether such termination be with or without cause, he will not enter the employ of any person, firm or corporation engaged in a similar line of business in any state referred to in the 2nd paragraph on page 2.1 of this agreement, nor himself engage during with period, directly or indirectly, as principal, atent or employee, in any business in competition with the Corporation in such State(s). The parties hereto recognize that the services to be performed by the Contractor are special and unique and that by reason of his association the Contractor will acquire confidential information as aforesaid. It is agreed that any breach of this agreement by the Contractor shall entitle the Corporation, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin any violation of this agreement.
[2] In Economic Research Analysts, Inc. v. Brennan, 232 So.2d 219 (Fla.4th DCA 1970), we held:

Subsection (2) provides that "... [O]ne who is employed as an agent or employee may agree with his employer ..." (Emphasis added). The use of the word "employed" in this context does not mean that the agent is thereby, ipso facto, in an "employer-employee" relationship, but the word is used and should be construed in a broader sense as referring to one who is hired, or engaged or used as an agent. The term "agent" necessarily contemplates the existence of a "principal" and implies employment or service coupled with delegated authority to manage some affair for or on behalf of the principal and on his account, and to render an accounting of it. Berney v. State, Fla. 1948, 38 So.2d 55. In simple terms, agency may be defined as the relation which results where one person called the principal, authorizes another, called the agent, to act for him with more or less discretionary power, in business dealings with third persons. 2 C.J.S. Agency § 1. Id. at 221.
See also, Babson Bros. Co. v. Allison, 337 So.2d 848 (Fla.1st DCA 1976), cert. denied, 348 So.2d 944 (Fla. 1977), wherein the court said:
It is not necessary, however, that one be an employee of a corporation in order to be its agent.